2009 UT 11

**Jenna R. HELF, Plaintiff and Appellant,**

v.

**CHEVRON U.S.A., INC., a Delaware corporation; Continental Petroleum Services, a Utah limited liability company; Skip Ferguson, an individual; Ondeo Nalco Company, a Delaware corporation; and Does I–X, Defendant and Appellee.**

**No. 20061170.**

Supreme Court of Utah.

Feb. 13, 2009.

964

Edward P. Moriarity, Salt Lake City, Shandar S. Badaruddin, Jacque M. Ramos, Missoula, MT, for appellant.

E. Scott Savage, Stephen R. Waldron, Susan E. Baird, Salt Lake City, for appellee.

PARRISH, Justice:

## INTRODUCTION

¶ 1 Jenna Helf ("Helf") sued Chevron U.S.A., Inc. ("Chevron"), for injuries she sustained while working at the Salt Lake City Refinery (the "Refinery"). Helf's complaint alleges that her injuries were caused by a chemical reaction that occurred when her supervisors directed her to neutralize toxic sludge through a chemical reaction in an open-air pit. She further alleges that another Chevron employee initiated an identical reaction in the same open-air pit, just hours prior to her injury, creating a large purple cloud that set off chemical alarms as it drifted across the Refinery. As a result of the reaction, several workers were sent home due to illness. But Helf's supervisors neither warned her about the earlier incident nor instructed her that she would need special respiratory protection. Because of her exposure to the toxic gases, Helf now suffers from a permanent seizure disorder. Helf sued Chevron for damages, arguing that her injuries fall within the intentional injury exception to the Workers' Compensation Act. The gravamen of Helf's complaint is that her supervisors directed her to initiate a chemical process that they knew, with substantial certainty, would result in the same dangerous conditions that occurred earlier that day and would injure whoever initiated the chemical reaction.

¶ 2 The district court dismissed Helf's complaint against Chevron without leave to amend pursuant to rule 12(b)(6) of the Utah Rules of Civil Procedure. We reverse the district court's dismissal because Helf's complaint successfully alleged facts demonstrating that her injury was the expected result of re-initiating the neutralization process such that her injury was intentional, not accidental or negligent. We reaffirm the "intent to injure" standard as the test for distinguishing between intentional and negligent or accidental injuries, but we caution courts to retain the distinction between intent and motive or probability when applying the test.

## BACKGROUND

¶ 3 When reviewing a grant of a 12(b)(6) motion to dismiss, "we accept the factual allegations in the complaint as true and consider them and all reasonable inferences to be drawn from them in a light most favorable to the plaintiff."[1] We recite the facts accordingly.

¶ 4 As part of the refining process, Chevron uses a caustic that is stored in tanks on the premises of the Refinery. Once the caustic has been used, it becomes "spent caustic," which must be removed from the tanks and the tanks must be cleaned. The resulting product is called "spent toxic sludge," an ultrahazardous substance that must be neutralized before it can be safely disposed of. In order to neutralize the spent caustic sludge, highly reactive acids are added, causing intense and violent reactions and creating ultrahazardous vapors known to cause serious and permanent injury to humans who breathe them.

¶ 5 Before Helf's injury, Chevron's standard method of removing and neutralizing the spent caustic sludge was to remove the tanks and their hazardous contents from the Refinery and to clean them under carefully controlled and restricted conditions. Using this method, Chevron employees were not exposed to the hazardous sludge or the vapors created during the cleaning process. The problem with this method was that it cost approximately $40,000 per tank.

¶ 6 On at least one occasion prior to the events giving rise to this case, Chevron attempted to clean a tank containing spent caustic sludge on the premises by using a vacuum truck. However, the resulting chem-

1. *Alvarez v. Galetka*, 933 P.2d 987, 989 (Utah 1997) (internal quotation marks omitted).

ical reaction endangered everyone involved by releasing intense heat and noxious vapors.

¶ 7 In January 1999, Chevron officials "pushed" to clean a particular tank containing spent caustic sludge. Before deciding what to do with the sludge, Chevron ran a laboratory test on it. The results indicated that the sludge was very basic, with a pH of 14.0, and that its sulfidic character was too high to measure. Rather than following its standard practice of sending the sludge away for treatment in a controlled environment, Chevron decided to try neutralizing the sludge in an "open-air pit" on the Refinery premises. The process involves pumping the spent caustic sludge into a pit, adding sulfuric acid in order to neutralize the basic character of the sludge, and "air rolling" the mixture with compressed air to induce a more complete and intense chemical reaction. Several experienced Chevron supervisors expressed reservations about the open-air neutralization method; nevertheless, Helf's supervisor ordered her to proceed neutralizing the caustic sludge in the open-air pit. Helf alleges that before initiating this process, all the parties in supervisory positions knew or should have known that the process would create noxious, dangerous, and harmful vapors. She further alleges that the process violated several state and federal rules and regulations.

¶ 8 The neutralization process was first initiated in the open-air pit during the day shift on January 28, 1999. When the neutralization process began, the sulfuric acid reacted with the spent caustic sludge and released a noxious purple cloud containing concentrated hydrogen sulfide, mercaptan gases, and other toxic chemical compounds. The neutralization process was stopped immediately after the toxic purple cloud appeared. The cloud drifted across the Refinery, setting off alarms and causing several Chevron employees, some of whom were hundreds of yards from the open-air pit, to fall ill and be sent home. In the aftermath, Chevron did not take any safety measures, such as locking out the sulfuric acid or pumping out the open-air pit. Instead, Chevron decided to resume the process later in the evening after a shift change and under cover of night.

¶ 9 When Helf arrived to work for the evening shift, her supervisor directed her to go to the open-air pit and start the neutralization process. She was not told about the earlier reaction, nor was she told about the hazardous conditions indicated by the plant alarms or about the employees that were sent home due to illness from exposure to the gases created by the reaction. She was also not instructed that she would need respiratory protection for this job, despite the fact that her supervisors knew that injury was substantially certain to occur if she initiated the chemical reaction without respiratory protection.

¶ 10 Helf followed the instructions given to her by her supervisor. The neutralization process produced the same predictable and violent reaction that occurred earlier that day—the release of a purple cloud containing noxious gases. The gases caused Helf to vomit and pass out. When she eventually came to, she stopped the process and returned to the building, suffering severe effects of exposure to high levels of hydrochloric acid, free mercaptans, and other toxic gases. She was not provided with any treatment or information about the chemicals to which she had been exposed. The Occupational Health and Safety Division of the Utah Labor Commission eventually cited Chevron for these events.

¶ 11 The Utah Labor Commission concluded that, as a result of this incident, Helf developed the following medical conditions: complex partial seizures, headaches, eye irritation, a twitching eyelid, nausea and vomiting, lethargy and weakness of extremities, disorientation, and mucous membrane irritation. Helf received $7,880.37 for her temporary, total disability during the time that she was unable to work due to her injuries. The Labor Commission also ordered that Chevron pay medical expenses for her treatment.

¶ 12 Based on the facts recited above, Helf filed a complaint with the district court requesting damages for the permanent and life-altering injuries she sustained due to her exposure to the noxious gases. In the complaint, she accused Chevron (and four other

parties not relevant to this appeal) of willful misconduct, intentional nonfeasance, negligent infliction of emotional distress, and intentional infliction of emotional distress.

¶ 13 Chevron filed a motion to dismiss Helf's claims pursuant to rule 12(b)(6) of the Utah Rules of Civil Procedure, arguing that the exclusive remedy provision of the Workers' Compensation Act[2] barred her claim. Without offering any rationale, the district court granted Chevron's motion and dismissed Helf's claims against Chevron with prejudice and without leave to amend. Helf pursued her claims against the remaining defendants. Following the district court's entry of a final order regarding the remaining claims, Helf appealed Chevron's dismissal. We have jurisdiction pursuant to Utah Code section 78A–3–102(3)(j) (2008).

### STANDARD OF REVIEW

¶ 14 "A rule 12(b)(6) motion to dismiss admits the facts alleged in the complaint but challenges the plaintiff's right to relief based on those facts."[3] "[T]he propriety of a 12(b)(6) dismissal is a question of law."[4] Accordingly, "we give the trial court's ruling no deference and review it under a correctness standard."[5]

### ANALYSIS

¶ 15 When the district court dismissed Helf's claim against Chevron with prejudice and without leave to amend, it impliedly concluded that Helf would be unable to allege any set of facts entitling her to relief. This conclusion is erroneous because Helf's complaint successfully pled facts that, when viewed in the light most favorable to her, demonstrate an intent to injure on the part of her supervisors who, regardless of their motivations, knew or expected that she would be injured when she re-initiated the neutralization process.

### I. THE WORKERS' COMPENSATION ACT AND THE INTENTIONAL INJURY EXCEPTION

¶ 16 The Workers' Compensation Act (the "Act") relieves employers of any common law liability for injuries sustained by an employee "on account of any accident or injury or death" that is "contracted, sustained, aggravated, or incurred by the employee in the course of or because of or arising out of the employee's employment."[6] In place of common law remedies, the Act creates an administrative scheme that seeks to provide a "simple, adequate, and speedy" remedy for workers injured on the job,[7] while also protecting employers from "disruptive or vexatious lawsuits" for alleged negligence.[8] We often term the Act's remedial scheme as a "quid pro quo" in which "employees are able to recover for job-related injuries without showing fault ... and employers are protected from tort suits by employees by virtue of the Act's exclusive remedy provision."[9]

¶ 17 The "primary objective" of workers' compensation "has been to remove industrial negligence, in all its forms, from the concept of the law of tort."[10] To this end, the Act includes an exclusive remedy provision, largely unaltered since 1949, that reads as follows:

2. Utah Code Ann. § 34A–2–105 (2005).

3. *Oakwood Vill. LLC v. Albertsons, Inc.*, 2004 UT 101, ¶ 8, 104 P.3d 1226 (internal quotation marks omitted).

4. *Alvarez v. Galetka*, 933 P.2d 987, 989 (Utah 1997) (internal quotation marks omitted).

5. *Id.* (internal quotation marks omitted).

6. Utah Code Ann. § 34A–2–105(1) (2005); *see also Bryan v. Utah Int'l*, 533 P.2d 892, 893 (Utah 1975).

7. *Park Utah Consol. Mines Co. v. Indus. Comm'n*, 84 Utah 481, 36 P.2d 979, 981 (1934).

8. *Bryan*, 533 P.2d at 893.

9. *Shattuck–Owen v. Snowbird Corp.*, 2000 UT 94, ¶ 19, 16 P.3d 555 (alteration in original) (citation and internal quotation marks omitted); *see also Bryan*, 533 P.2d at 893 ("The whole thrust of the [workers' compensation system] was to provide a remedy for the employee, injured in an industrial accident, while at the same time protecting the employer from disruptive or vexatious lawsuits, because of the employer's alleged negligence.").

10. *Bryan*, 533 P.2d at 893.

The right to recover compensation pursuant to this chapter for injuries sustained by an employee, whether resulting in death or not, shall be the exclusive remedy against the employer ... and the liabilities of the employer imposed by this chapter shall be in place of any and all other civil liability whatsoever, at common law or otherwise, to the employee ... on account of any accident or injury or death, in any way contracted, sustained, aggravated, or incurred by the employee in the course of or because of or arising out of the employee's employment, and no action at law may be maintained against an employer ... based upon any accident, injury, or death of an employee.[11]

¶ 18 In *Bryan v. Utah International,* we recognized that the exclusive remedy provision did not prohibit an employee from maintaining an action for damages due to an intentional tort.[12] Accordingly, we allowed an employee to bring a tort claim against his supervisor for injuries sustained when the supervisor intentionally caused a large cable to hit the employee's body.[13] This is known as the intentional injury exception.

¶ 19 The scope of the intentional injury exception is at issue in this case. Specifically, the parties disagree regarding the level of intent necessary to trigger the intentional injury exception. Helf urges us to adopt a standard in which intent to injure would be imputed where an injury is "substantially certain" to occur. She attributes this definition to a battery case, *Wagner v. State,* in which we relied on the Second Restatement of Torts to define the intent standard for battery.[14] On the other hand, Chevron urges us to adopt the "intent to injure" standard, which it attributes to a court of appeals case, *Lantz v. National Semiconductor Corp.*[15] Under this standard, Chevron would not be liable absent a " 'conscious and deliberate intent directed to the purpose of inflicting

injury.' " [16] Using this definition, Chevron argues that an intentional act is only actionable if it is accompanied by an additional malicious desire to injure.

¶ 20 Both parties misunderstand the intent requirement. Helf conflates probability with intent and Chevron conflates motive or desire with intent. To clarify these misunderstandings, we will first review the existing case law that defines and applies the intentional injury exception. Second, we will affirm the "intent to injure" standard from *Lantz* and explain how it aids in distinguishing between intentional and accidental injuries. We will also distinguish intent from both motivation and probability. Finally, we will apply the intent to injure standard to Helf's case, concluding that her complaint satisfies the "intent to injure" standard.

### A. Existing Case Law Applying the Intentional Injury Exception

¶ 21 We first turn to our existing case law. This court first articulated the intentional injury exception in *Bryan.* Recognizing that the Act is remedial and designed to implement a social policy, we noted that the legislature had defined "personal injury, by accident, [to] include injury caused by the willful act of a third person" and that "willful" implied "something in addition to mere negligence." [17] We concluded, however, that an intentional act differed from a willful act, and that the word intentional, "when used to describe a wrongful act ... [means] that the act was not only done knowingly, but with the knowledge that it was wrongful to do it." [18] Thus, following *Bryan,* the exclusive remedy provision barred employee suits for injuries caused by negligent or willful acts, but not for intentionally injurious—i.e., wrongful—acts.

¶ 22 Sixteen years later, in *Mounteer v. Utah Power & Light Co.,* we again applied

---

11. Utah Code Ann. § 34A–2–105(1).

12. *Bryan,* 533 P.2d at 894.

13. *Id.* at 892.

14. 2005 UT 54, ¶ 22, 122 P.3d 599.

15. 775 P.2d 937 (Utah Ct.App.1989).

16. *Id.* at 939 (quoting *Hildebrandt v. Whirlpool Corp.,* 364 N.W.2d 394, 396 (Minn.1985)).

17. *Bryan,* 533 P.2d at 894.

18. *Id.*

the intentional injury exception.[19] Mounteer, the plaintiff, brought suit against his employer, Utah Power & Light Co. ("UP & L"), for injuries caused when his co-employee called the supervisor over a loudspeaker and accused Mounteer of being on drugs.[20] We stated that the exclusive remedy provision barred "any common law action against the employer unless he or she intended or directed the injurious act of the co-worker."[21] In applying this rule, we analyzed whether UP & L ordered the broadcast, but did not analyze whether UP & L ordered that the broadcast be injurious.[22] We upheld the dismissal of Mounteer's suit because he had not provided evidence that UP & L directed or intended the broadcast. In fact, the only evidence provided by Mounteer was an allegation that the broadcast violated UP & L's company policy. With only this piece of information, we reasoned that no inference could be made that UP & L directed or intended the broadcast.[23]

¶ 23 During the interim between *Bryan* and *Mounteer*, the court of appeals decided *Lantz*.[24] In *Lantz*, an employee's injuries from exposure to a chemical spill that occurred in his work area were allegedly exacerbated by delayed evacuation.[25] Lantz argued that the failure to issue an evacuation order constituted an intentional tort because injury was "substantially certain" to result from his exposure to fumes. Relying almost entirely on Larson's treatise, *The Law of Workmen's Compensation*,[26] ("Larson's"), the court of appeals rejected this argument.[27]

Instead, the court of appeals concluded that the intentional injury exception only applied "in situations characterized by 'a conscious and deliberate intent directed to the purpose of inflicting injury.'"[28] This standard requires "an injured employee to show that his employer or fellow employee manifested a deliberate intent to injure him."[29] This is the same standard adopted by a majority of jurisdictions,[30] although twelve states have recognized a broader definition of "intentional" in order to subject some employers to liability for gross negligence.[31]

¶ 24 We join the majority of states in adopting the "intent to injure" standard in order to distinguish between intentional injuries that fall within the intentional injury exception and negligent or accidental injuries, which are covered by the exclusive remedy provision of the Act.

### B. Distinguishing Between Intentional and Accidental Injuries, Regardless of the Actor's Motivation

¶ 25 In attempting to apply the "intent to injure" standard the parties miss the mark by urging us to adopt or reject *Lantz*'s definition of intent. *Lantz* offers only a rhetorically circular definition of "intent" as a "conscious and deliberate intent directed to the purpose of inflicting injury."[32] After reading this definition, the question remains, what does "intent" mean? Does it mean that the actor knew that his action would inflict injury? Does it require that the actor's motive or desire was to inflict injury? What if

19. 823 P.2d 1055 (Utah 1991).

20. *Id.* at 1056.

21. *Id.* at 1058.

22. *Id.*

23. *Id.*

24. 775 P.2d 937.

25. *Id.* at 938.

26. The court of appeals cited 2A A. Larson, *The Law of Workmen's Compensation* §§ 68.13, 68.14, 68.21, 68.23 (1988). Throughout this opinion, we rely on the more recent version, 6 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law* (2000)[hereinafter Larson's].

27. *Lantz*, 775 P.2d at 940.

28. *Id.* at 939 (quoting *Hildebrandt*, 364 N.W.2d at 396).

29. *Id.* at 940.

30. Larson's, *supra* note 26, § 103.03 ("[T]he common-law liability of the employer cannot, under the almost unanimous rule, be stretched to include accidental injuries.").

31. *Id.* § 103.04[1].

32. *Lantz*, 775 P.2d at 940 (emphasis removed)(internal quotation marks omitted).

the actor knows that his action is likely to inflict injury, but sincerely hopes that no injury will result? These questions suggest that the actor's motive or desire may be irrelevant to the existence of legal intent.

¶ 26 Rather than defining and determining intent, the "intent to injure" analysis focuses on whether the actor knew or expected that injury would occur as a consequence of his actions, thereby distinguishing between intentional and unintentional workplace injuries under the Act. In clarifying and applying this standard, we draw on the concept of an accident because it is the antithesis of an intentional act. The "intent to injure" standard is necessary because an accidental injury may result from an intentional act, such as when an employer intentionally pushes a barrel that accidentally hits an employee. We would not say that the employer intentionally injured the employee even though he intentionally pushed the barrel. On the other hand, we would say that the employer intentionally injured the employee if he intentionally pushed the barrel, knowing or expecting that the employee was standing on the other side. Thus, the "intent to injure" standard distinguishes between intentional acts resulting in unknown or unexpected injuries, which are covered under the Act by workers' compensation, and intentional acts resulting in known or expected injuries, which fall within the intentional injury exception.

¶ 27 The concept of an accident is central to the intentional injury analysis. According to *Black's Law Dictionary,* an accident is an "*unintended* and unforeseen injurious occurrence." [33] The concept of an accident is also woven throughout *Larson's* articulation of the "intent to injure" standard. For example, when introducing the "intent to injure" standard, *Larson's* explains that the legal justification for the intentional injury exception is the "*nonaccidental* character of the injury." [34] For this reason, "the liability of the employer cannot ... be stretched to include *accidental injuries* caused by the gross, wanton, willful, deliberate, intentional, reckless, culpable or malicious negligence, breach of statute, or other misconduct of the employer...." [35] Perhaps the most obvious example demonstrating how the concept of an accident is integrally related to the "intent to injure" standard is this statement in *Larson's:* "[W]hat is being tested here is not the degree of gravity or depravity of the employer's conduct, but rather the narrow issue of the intentional versus the accidental quality of the precise event producing injury." [36]

¶ 28 Using the concept of an accident to distinguish between intentional and unintentional injuries also supports the underlying policy of the Act. The "primary objective" of workers' compensation is "to remove industrial negligence, in all its forms, from the concept of the law of tort." [37] The Act's passage was motivated by the "inevitable increase in industrial accidents born of the industrial revolution." [38] As the Michigan Supreme Court stated, "Accidents are an inevitable part of industrial production; intentional torts by employers are not." [39]

¶ 29 Our body of case law distinguishing between accidents and intentional injuries in the context of insurance claims is helpful because it clarifies that an expected injury is not an accident. [40] In *N.M. v. Daniel E.,* we held that to determine whether an injury is intentional or accidental, we consid-

---

33. *Black's Law Dictionary* 15 (8th ed.2004) (emphasis added).

34. Larson's, *supra* note 26, § 103.03 (emphasis added).

35. *Id.*

36. *Id.*

37. *Bryan,* 533 P.2d at 893.

38. *Id.*

39. *Beauchamp v. Dow Chemical Co.,* 427 Mich. 1, 398 N.W.2d 882, 889 (1986) (*superseded by statute,* Mich. Comp. Laws § 418.131 (1987)).

40. *See, e.g., Richards v. Standard Accident Ins. Co.,* 58 Utah 622, 200 P. 1017, 1023 (1921) ("An effect which is the natural and probable consequence of an act or course of action is not an accident.... It is either the result of actual design, or it falls under the maxim that every man must be held to intend the natural and probable consequence of his deeds." (internal quotation marks omitted)).

er whether "the result was intended or expected," rather than focusing on whether the act causing the injury was intentional.[41] Under this approach, an intentional act "may result in an accident if the *result* was unexpected [and] unanticipated."[42] The corollary to this holding is that an act is not accidental if the *result* was expected and anticipated, even if the actor subjectively hoped that injury would not occur. Thus, a speeding motorist who collides with another vehicle is still involved in an "accident" because "while the motorist did intend to exceed the speed limit, he did not intend to cause a collision."[43] Under this standard, intent attaches "not based on a recognition of what possibly could happen, but rather, what probably would happen."[44] Thus, under our case law, a plaintiff may successfully plead an intentional injury by showing that the injury was *either* intended or expected.

¶ 30 Although not clearly articulated in the cases, the purpose of the "intent to injure" standard as a tool for distinguishing between intentional and accidental or unexpected injuries is apparent if we step back and compare *Lantz* to *Bryan* and *Mounteer*. *Lantz* involved an accidental chemical spill. There was no allegation that the chemical spill was expected or intentional. Instead, Lantz alleged that because it was "substantially certain" that he would be injured by the chemical fumes, the refusal to issue an evacuation order was an intentional injury. The facts revealed, however, that the factory where Lantz worked had a policy allowing workers to evacuate themselves if they felt that they were in danger, and many of Lantz's coworkers did so.[45] Thus, Lantz's intentional injury claim boiled down to an allegation that when Lantz asked permission to evacuate, the supervisor, who was not Lantz's supervisor, was negligent for failing to ascertain the danger posed by the chemical spill that occurred in a distant part of the factory and for

assuming that Lantz would evacuate himself if the conditions became too dangerous. Using the "intent to injure" standard, the court of appeals rejected Lantz's effort to transform a negligence claim into an intentional injury claim. Under the "intent to injure" standard, the supervisor would only be liable if he knew or expected that injury would result from his failure to evacuate and he intentionally chose not to evacuate. By focusing the court's attention on the subjective knowledge or expectation of the actor, the "intent to injure" standard aids in distinguishing between an intentional injury and an accidental injury that arises from an intentional decision.

¶ 31 In contrast to *Lantz*, the decisions in *Bryan* and *Mounteer* addressed indisputably intentional, rather than negligent, acts. Accordingly, it was not necessary to apply the "intent to injure" test to determine whether the injury was the product of negligence or intent. In *Bryan*, the supervisor intentionally caused a large steel cable to hit Bryan's body.[46] There was no allegation that the cable accidentally hit Bryan or that the supervisor made an intentional but foolish choice, unintentionally causing the cable to swing into Bryan's body. Similarly, in *Mounteer*, there was no allegation that the announcement over the loudspeaker was accidental or inadvertent.[47] Thus, in *Bryan* and *Mounteer*, the injury-producing activities were clearly intentional, while in *Lantz*, the injury-producing activity—the chemical spill—was an accident. This is why only *Lantz* applied the "intent to injure" standard to distinguish between intentional and unintentional injuries.

¶ 32 We also note that the "intent to injure" standard that we have adopted is consistent with the intentional injury standard articulated in *Bryan*. In *Bryan*, we

41. 2008 UT 1, ¶ 11, 175 P.3d 566.

42. *Id.* (emphasis and alteration in original)(internal quotation marks omitted); *see also Kellogg v. Cal. W. States Life Ins. Co.*, 114 Utah 567, 201 P.2d 949, 951 (1949) ("[I]f death is an unexpected result of an intended act it is to be considered accidental.").

43. *N.M.*, 2008 UT 1, ¶ 11 n. 6, 175 P.3d 566.

44. *Id.* ¶ 15.

45. *Lantz*, 775 P.2d at 938.

46. *Bryan*, 533 P.2d at 892.

47. *Mounteer*, 823 P.2d at 1056.

held that the exclusive remedy clause did not insulate an employer from liability for a "wrongful act" that was "done knowingly [and] with the knowledge that it was wrongful to do it." [48] Obviously, directing an employee to perform an act that the employer knows or expects will result in injury is a wrongful act that is done knowingly and with knowledge that it is wrongful. The "intent to injure" standard is simply a narrower version of the *Bryan* standard that we apply to determine whether the injury was the product of intent or negligence. In applying the standard, however, we caution courts to avoid two traps that could produce an erroneous application of the "intent to injure" standard.

1. Maintaining the Distinction Between Intent and Motive or Desire

¶ 33 We first caution courts to maintain the distinction between motive and the legal concept of intent. Distinguishing between these concepts is difficult because intent and motive, as used in our everyday language, are often synonymous. For example, when we state, "John intentionally injured Sheila," we assume that John's motivation was to injure Sheila. The legal concept of intent, however, is broader than motive or desire. Under the legal definition of intent, we would say that John intentionally injured Sheila if he took an action that he knew or expected would result in injury to Sheila, even if his motive for acting was not to injure Sheila. For example, if John intentionally shot a gun in Sheila's direction, Sheila's injury would be intentional, even if John's motivation was to joke rather than to injure.[49] Thus, the legal definition of intent encompasses more than simply motive.

¶ 34 The distinction between intent and motive is particularly important in applying the "intent to injure" standard because an intentional injury may arise in instances where the employer intentionally placed an employee in harms way, but the employer's motive was to increase profits—not to inflict injury. A tragic case from New Mexico illustrates the danger of ignoring this distinction.

¶ 35 In *Delgado v. Phelps Dodge Chino, Inc.*, the plaintiff-employee worked in a smelting plant that distilled copper ore from rock by superheating the unprocessed rock to over 2000 degrees Fahrenheit.[50] On the night of his injury, Delgado's crew was short-handed and was pressured by the supervisors to work harder in order to compensate for losses that the plant sustained during a recent ten-day shut down.[51] An emergency situation arose when the processing system malfunctioned, threatening an overflow of molten rock. The situation could have been safely resolved by shutting down the furnace. Instead, the supervisors directed Delgado, who had never addressed this type of emergency situation, to go into a tunnel below the furnace and stop the flow of molten rock.[52] Delgado entered the tunnel and saw that the molten rock was overflowing its container. He radioed his supervisor for help, explaining that he was neither qualified nor able to address the situation. His supervisor insisted that he proceed alone. "Shortly after Delgado entered the tunnel, the lights shorted out and black smoke poured from the mouth of the tunnel. Delgado's co-workers watched as he emerged from the smoke-filled tunnel, fully engulfed in flames." [53] Delgado died three weeks later.

¶ 36 The New Mexico Supreme Court rejected the "intent to injure" standard, partially based on its conclusion that the "intent

48. *Bryan*, 533 P.2d at 894.

49. *See, e.g., Wagner*, 2005 UT 54, ¶¶ 29–32, 122 P.3d 599; *Caudle v. Betts*, 512 So.2d 389, 391 (La.1987) ("The intent with which tort liability is concerned is not necessarily a hostile intent, or a desire to do any harm. Rather it is an intent to bring about a result which will invade the interests of another in a way that the law forbids. The defendant may be liable although intending nothing more than a good-natured practical joke ...." (citation omitted)).

50. 2001–NMCA–34, ¶ 3, 131 N.M. 272, 34 P.3d 1148.

51. *Id.* ¶ 4.

52. *Id.*

53. *Id.* ¶ 5.

to injure" standard would allow "an employer who knows his acts will cause certain harm or death to an employee [to] escape personal responsibility for an act by merely claiming that he/she hoped the employee would make it." [54] The court also concluded that under an "intent to injure" standard, "[a]s long as the employer is motivated by greed, rather than intent to injure the worker, the employer may abuse workers in an unlimited variety of manners while still enjoying immunity from tort liability." [55]

¶ 37 We disagree with the New Mexico Supreme Court's approach to the "intent to injure" standard because we believe it conflates intent with desire or motive. " '[Intent] is broader than a desire or purpose to bring about physical results.... The actor who fires a bullet into a dense crowd may fervently pray that the bullet will hit no one, but if the actor knows that it is unavoidable that the bullet will hit someone, the actor intends that consequence.' " [56] Under the "intent to injure" standard, it does not matter whether Delgado's supervisors sent him into the tunnel because they wanted to maintain production quotas, or whether they sent him into the tunnel because they disliked him and hoped he would be injured. If the supervisors, expecting injury as a consequence, chose to send an inexperienced employee into a tunnel where molten rock was threatening to overflow instead of shutting down the furnace, the resulting injuries cannot be considered accidental. Thus, we believe that the facts in *Delgado* would have satisfied the "intent to injure" standard regardless of the supervisor's motivation. *Delgado* also illustrates the importance of distinguishing between "intent" and motive or desire when applying the "intent to injure" standard.

2. Maintaining the Distinction Between Intent and Probability

¶ 38 We also caution courts to remain cognizant of the distinction between intent and probability. Helf urges us to reject the "intent to injure" standard and instead adopt the "substantially certain" standard, arguing

that an actor need not actually "intend harm" in order to commit an intentional tort if harm is "substantially certain" to result. Helf's primary argument against the "intent to injure" standard is that it would "insulate employers from the consequences of their intentional, wrongful acts so long as the actor does not intend to bring about the harm although it is substantially likely to occur."

¶ 39 We decline to adopt the "substantially certain" test for two reasons. First, Helf fails to recognize that it is the Act, not the "intent to injure" standard, that insulates employers and fellow employees from liability for injuries or accidents that are likely, but not certain, to occur. These injuries are the product of negligence and, as such, are covered by the exclusive remedy provision. Whether the social benefits of this system outweigh the concerns articulated by Helf is a question for the legislature.

¶ 40 Second, Helf conflates probability with intent, suggesting that intent may be imputed where a high probability of injury exists because the employer knew that harm was substantially likely to occur sometime to some employee. Adopting this standard would unravel the structure of the Act. Almost every form of employment bears some risk of injury. Employers willing to expend the time and effort could sit down and calculate with some specificity the number of employees likely to be injured on the job in a year. In fact, these types of calculations inform insurance decisions and OSHA regulations. It does not make sense that a risk calculation, which is intended to expose the likelihood of an uncertain or unexpected event, could transform an unexpected or uncertain event (an accident) into an intentional injury. Such an approach would ignore the intent requirement altogether.

¶ 41 We agree with the South Dakota Supreme Court, which has carefully maintained the distinction between intent and probability in intentional tort cases. "More than knowledge or appreciation of risk

---

54. *Id.* ¶ 18 (internal quotation marks omitted).

55. *Id.*

56. *Beauchamp,* 398 N.W.2d at 895 (quoting W. Page Keeton, *Prosser and Keeton on the Law of Torts* § 8 (5th ed.1984)) (alteration in original).

is required to establish intentional conduct. The known danger must cease to become only a foreseeable risk which an ordinary, reasonable, prudent person would avoid (ordinary negligence) and become a substantial certainty."[57] In *Fryer v. Kranz,* the court concluded that an injury was unintentional because it was "not a matter of *when* [the injury] would happen (a certainty), it was a question of *if* it would [happen] (a probability)."[58] Thus, to demonstrate an intentional injury in South Dakota, the plaintiff must show that "the employer had actual knowledge of the dangerous condition and that the employer still required the employee to perform."[59] This approach maintains the distinction between intent and probability by focusing on whether the actor knew or expected that injury would occur to a particular employee performing a specific task in determining whether an injury was intentional. It does not focus on whether an injury was substantially certain to occur to an unknown employee at some future time—an inquiry driven by probability, not intent.

¶ 42 Other courts have failed to maintain the distinction between intent and probability. For example, Ohio courts determine whether an injury is "substantially certain to occur" in order to evaluate whether the injury is intentional and they occasionally resort to statistics to determine the likelihood that the injury will occur.[60] We agree with the South Dakota Supreme Court that such an approach "blur[s] the line between cases involving only negligent or reckless conduct and those involving true intent to injure."[61]

 ¶ 43 We therefore hold that the "intent to injure" standard requires a specific

mental state in which the actor knew or expected that injury would be the consequence of his action. To demonstrate intent, a plaintiff may show that the actor desired the consequences of his actions, or that the actor believed the consequences were virtually certain to result. But a plaintiff may not demonstrate intent by showing merely that some injury was substantially certain to occur at some time. For a workplace injury to qualify as an intentional injury *under the* Act, the employer or supervisor must know or expect that the assigned task will injure the particular employee that undertakes it. In other words, the employer must know or expect that a specific employee will be injured doing a specific task. In these situations, the knowledge and expectation that injury will occur robs an injury of its accidental character, moving it out of the realm of negligence and into the realm of intent.

### C. Helf's Allegations Satisfy the "Intent to Injure" Standard

 ¶ 44 Helf's complaint alleges facts supporting the conclusion that her injury was intentional, rather than accidental, because her supervisors knew or expected that re-initiating the neutralization process would result in her injury. When Helf arrived at work on January 28, 1999, the neutralization process had already been initiated once, resulting in a noxious purple cloud that contained concentrated hydrogen sulfide, mercaptan gases, and other toxic chemical compounds. As the cloud drifted across the Refinery, it set off safety alarms and caused employees hundreds of yards away to fall ill and be sent home. Between this initial incident and Helf's incident, no

57. *Fryer v. Kranz,* 616 N.W.2d 102, 106 (internal quotation marks omitted).

58. *Id.* ¶ 25.

59. *Id.* ¶ 13 (internal quotation marks omitted).

60. *See, e.g., Padney v. MetroHealth Med. Ctr.,* 145 Ohio App.3d 759, 764 N.E.2d 492, 497–98 (2001) (concluding that a directed verdict for an employer was improper where a reasonable jury may have found a 25–30% chance of being infected with tuberculosis from an autopsy a "substantial certainty"); *Bryant v. Lawson Milk Co.,* 22 Ohio App.3d 69, 488 N.E.2d 934, 938 (1985) (considering, as part of the "substantial certain-

ty" analysis, that the defendant had experienced two hundred seventy-four robberies in its stores over the course of five years, nine of which occurred at the store where the plaintiff worked); *Helton v. King Kwik Minit Market, Inc.,* 24 Ohio Misc.2d 34, 36, 495 N.E.2d 62 (Ct.Com.Pl.1985) (concluding that robbery and rape in a twenty-four hour convenience store during late night hours was not "substantially certain" to occur because only seven out of twelve hundred employees had been assaulted or molested during the past five years).

61. *Fryer,* 2000 SD 125, ¶ 26, 616 N.W.2d 102.

safety measures were taken, such as pumping out the pit or locking out the sulfuric acid. When Helf was directed to start the neutralization process after she arrived at work, she was neither warned of the earlier incident, nor instructed that she would need protective respiratory gear.

¶ 45 Furthermore, Chevron had additional knowledge regarding the dangerousness of the caustic solution. Chevron knew that the caustic sludge was extremely toxic and that the neutralizing process produced intense and violent reactions and ultrahazardous vapors. On one previous occasion, Chevron had attempted to neutralize the caustic sludge onsite in a procedure that was more controlled than the open-air pit technique. That attempt produced large amounts of heat and noxious vapors, exposing the employees to a great risk of injury.

¶ 46 In light of the incident earlier in the day on January 28, 1999, the fact that no mitigation measures were employed to protect Helf from the same fate, and Chevron's knowledge, gained through experience and expertise, of the toxic character of the sludge, Helf's complaint alleged facts that could convince a reasonable jury that her injuries were the expected result of re-initiating the neutralization process. Thus, Helf's complaint satisfies the "intent to injure" standard because it alleges that Helf's supervisors knew or expected that whoever re-initiated the neutralization process in the open-air pit would be injured by exposure to the toxic gases released by the process.

## II. CHEVRON'S CORPORATE LIABILITY FOR THE ACTS OF ITS SUPERVISORS

¶ 47 Finally, Chevron's brief raises the corporate status of Chevron, suggesting that in order to hold Chevron liable for the acts of Helf's supervisors, Helf must either demonstrate that her injury was inflicted by a supervisor who was an alter ego of Chevron or that her injury was inflicted by a co-employee who acted with an intent to injure and that the act was directed or intended by Chevron. This suggestion is a slight mischaracterization of the law.

¶ 48 This court has long recognized the general rule that "an employer can be held vicariously liable for the intentional tortious acts of employees under the theory of respondent superior if those acts are conducted within the scope of employment." [62] Whether or not an action is within the scope of employment is a factual inquiry that is evaluated under the three-part test announced in *Birkner v. Salt Lake County*.[63] Under this test, "the employee's conduct must (1) 'be of the general kind the employee is employed to perform,' (2) 'occur within the hours of the employee's work and the ordinary spatial boundaries of the employment,' and (3) 'be motivated, at least in part, by the purpose of serving the employer's interest.' " [64] The employer faces no vicarious liability if the employee "acts on entirely personal motives unrelated to the employer's interests." [65]

¶ 49 The rule cited by Chevron comes from specific discussion in *Larson's* about when an employer may be held liable for a supervisor's intentional assault on an employee. The specialized rule recognizes that assaults generally do not serve corporate interests or the employer's interests.[66] "Unless the employer has commanded or expressly authorized the assault, it cannot be said to be intentional from the employer's standpoint ... [because] to the employer, it is just one more industrial mishap in the factory of the sort the employer has a right to expect to be exclusively covered by the compensation system." [67] Helf's injury does not fall within this specialized application of the vicarious liability rule. Accordingly, Chevron's liability will depend on whether Helf's supervisors were acting within the

62. *Clark v. Pangan,* 2000 UT 37, ¶ 8, 998 P.2d 268.

63. 771 P.2d 1053, 1056–57 (Utah 1989).

64. *Clark,* 2000 UT 37, ¶ 20, 998 P.2d 268 (quoting *Birkner,* 771 P.2d at 1057).

65. *Id.* ¶ 18.

66. Larson's, *supra* note 26, § 103.08.

67. *Id.* § 103.06.

scope of their employment when they directed her to re-initiate the neutralization process.

## CONCLUSION

¶ 50 In summary, we retain the "intent to injure" standard as a test for differentiating between intentional injuries and injuries that are accidental or the product of negligence. In order to satisfy the "intent to injure" standard, a plaintiff must show that her injury resulted from an act that the actor knew or expected would cause injury. This standard does not require a motive to injure, but it cannot be satisfied by merely demonstrating that there was a high probability of injury. Helf's complaint successfully alleges an intentional injury because she pled facts suggesting that when her supervisors directed her to re-initiate the neutralization process, they knew or expected that she would be injured by the resulting noxious gases. Therefore, the intentional injury exception to the Act applies.

¶ 51 This rule is consistent with the purpose and the policy of the Act. It protects employees, recognizing that "[t]he policy of our law has always been to allow one injured through the intentional act of another, to seek redress from the one intending harm" and that this "policy has the salutary effect of deterring intentional injury." [68] And it protects employers, insulating them from vexatious and ruinous lawsuits for industrial accidents that are unavoidable in an industrial society, while recognizing "that the legislature could not be presumed to have intended to permit an intentional tortfeasor to shift his liability to a fund paid for with premiums collected from innocent employers." [69]

¶ 52 As a result, we reverse the district court's dismissal of Helf's complaint and remand for further proceedings consistent with this opinion.

¶ 53 Chief Justice Durham, Associate Chief Justice Durrant, and Justice Nehring concur in Justice Parrish's opinion.

WILKINS, Justice, concurring in part, and dissenting in part:

¶ 54 I concur in the analysis advanced by my colleagues regarding the application of the intentional injury exception to the Workers' Compensation Act. However, in a case such as the one before us where the claimant-employee has elected to pursue the benefits afforded under the Workers' Compensation Act, I believe doing so is an election of remedy by the claimant that prohibits further suit against the employer under any exclusion from the Act. Simply put, either a claim falls within the Act, or it does not as a result of some exception to the Act's applicability. It cannot be both. If an employee injured on the job elects to pursue the benefits of the Act, that decision brings with it the burdens of the Act too, namely the exclusive remedy provisions applicable to the employer. As a result, although I agree the district court got the law wrong, I believe it got the result right. I would affirm on that basis.

---

**68.** *Bryan v. Utah Int'l*, 533 P.2d 892, 894 (Utah 1975).

**69.** *Collier v. Wagner Castings Co.*, 81 Ill.2d 229, 41 Ill.Dec. 776, 408 N.E.2d 198, 203 (1980).