*This opinion is subjec1t to revision before final
publication in the Pacific Reporter*

**2015 UT 81**

IN THE

### SUPREME COURT OF THE STATE OF UTAH

JENNA R. HELF,
*Appellant,*

*v.*

CHEVRON U.S.A. INC,
*Appellee.*

No. 20130700
Filed September 4, 2015

Third District, Salt Lake
The Honorable Anthony B. Quinn
No. 030901338

Attorneys:

Troy L. Booher, Clemens A. Landau, Noella A. Sudbury,
Salt Lake City,
Edward P. Moriarity, Bradley L. Booke, Shandar S. Badaruddin,
Missoula MT, for appellant

John A. Anderson, Jill M. Pohlman, Jason W. Crowell,
Timothy M. Considine, Salt Lake City, for appellee

JUSTICE DURHAM authored the opinion of the Court in which
CHIEF JUSTICE DURRANT, JUSTICE PARRISH, and JUDGE TOOMEY joined.

JUSTICE LEE filed a dissenting opinion.

Having recused himself, JUSTICE HIMONAS does not participate
herein; COURT OF APPEALS JUDGE KATE A. TOOMEY sat.

JUSTICE DURHAM, opinion of the Court:

### INTRODUCTION

¶1    Jenna Helf worked at an oil refinery operated by Chevron U.S.A. Inc. Her supervisor instructed her to add sulfuric acid to an open-air pit containing waste products from the refinery and she was injured by a poisonous gas produced by the resulting chemical reaction. Ms. Helf obtained workers' compensation benefits for her injuries. She then sued Chevron, alleging it was liable for an

intentional tort because her supervisors knew that she would be injured when her immediate supervisor instructed her to add sulfuric acid to the pit.

¶2 Chevron moved for summary judgment, arguing that (1) Ms. Helf had not produced evidence that Chevron's managers knew or expected that Helf would be injured when her supervisor told her to add sulfuric acid to the pit and (2) Ms. Helf could not prevail as a matter of law because her election to obtain workers' compensation benefits for her injury barred her from seeking a tort remedy. The district court concluded that the election of remedies doctrine did not bar her suit. But the court agreed with Chevron that Ms. Helf failed to produce evidence that would support a conclusion that one of Chevron's mangers has the requisite knowledge or intent to support an intentional tort claim. The district court therefore granted summary judgment.

¶3 Ms. Helf now appeals, arguing that summary judgment was not appropriate. Chevron also purports to cross-appeal from the district court's ruling that the election of remedies doctrine does not bar Ms. Helf's tort claim.

¶4 We hold that the district court erred by granting summary judgment. Ms. Helf produced evidence that when a worker added sulfuric acid to the pit earlier that same day, a chemical reaction produced a poisonous gas that triggered emergency alarms located 150 feet from the pit and made workers in other areas of the refinery sick. There is a dispute of material fact precluding summary judgment because a reasonable jury could conclude that at least one of Chevron's managers knew that Ms. Helf would be injured when her supervisor instructed her to initiate this same process.

¶5 We also hold that the district court correctly ruled that the election of remedies doctrine does not bar her lawsuit. We agree with other courts that have held that workers are not required to choose between accepting workers' compensation benefits and an intentional tort claim.

¶6 We therefore reverse the district court's summary judgment ruling and remand for further proceedings consistent with this opinion.

## BACKGROUND

¶7 Chevron operates an oil refinery near Salt Lake City. The refinery contains a concrete-lined, open-air pit that is used to process various liquid and solid waste products from the refinery. One of the liquid waste products collected in the pit is mildly acidic steam

condensate from the refining process, which continuously flows into the pit. Before the pit is emptied, workers ensure that the pH level of the contents of the pit falls within an acceptable range. If the pH level of the pit is too high, workers add sulfuric acid to the pit by opening a valve. To mix the sulfuric acid with the contents of the pit, workers open another valve that forces compressed air below the surface and roils the pit. This process lowers the pH level of the contents of the pit and is called "neutralizing the pit" by refinery workers. Once the pH level is acceptable, the contents of the pit are then pumped into anther storage facility for further processing.

¶8      In December 1998, managers debated how to dispose of high-pH sludge that had accumulated in one of the tanks used by the refinery. They ultimately decided to transfer the caustic sludge to the open-air pit and lower the pH level by adding sulfuric acid. Some managers, however, expressed doubts as to whether this plan was appropriate.

¶9      In January 1999, Chevron managers put their plan into effect. Neither the pit operator, who had five years of experience, nor the day-shift supervisor, who had worked at the refinery for a much longer period of time, had ever observed the pit being used to process that type of caustic sludge. When the pit operator and the day-shift supervisor found out about the plan to process the sludge in the pit, both of them thought that it was not a "good idea." Despite their misgivings, someone directed workers to dump the sludge into the pit.

¶10      The day-shift supervisor instructed the pit operator to neutralize the contents of the pit. The operator partially opened the compressed-air valve in order to create a "small air roll" in the pit, limiting the speed with which the chemicals in the pit would mix together. The pit operator then opened the valve that released sulfuric acid into the pit. Because of the operator's years of experience, he immediately moved away from the pit and stood upwind in order to avoid breathing fumes caused by the neutralization process. He had also learned from experience to hold his breath when approaching the pit to turn off the sulfuric acid valve in order to avoid breathing toxic fumes.

¶11      The sulfuric acid interacted with sulfides contained in the sludge to create a cloud of hydrogen sulfide gas. Hydrogen sulfide is heavier than air and highly toxic. It causes illness, damage to internal organs, convulsions, coma, or death, depending on the level of exposure. The hydrogen sulfide gas traveled downwind and triggered an emergency alarm when it reached sensors designed to detect the gas located about 150 feet from the pit. Due to the alarm,

the day-shift supervisor directed the pit operator to stop the flow of sulfuric acid into the pit.

¶12 The hydrogen sulfide gas drifted downwind towards other sections of the refinery. Workers throughout the refinery complained of the "rotten-egg" smell associated with the gas. Several workers also became ill, complaining of headaches, dizziness, and nausea—symptoms associated with lower-level exposure to hydrogen sulfide. At least one employee who worked in the administration building, which was located over 1,000 feet from the open-air pit, got sick. Chevron managers evacuated the administration building and sent the employees home for the day.

¶13 Chevron managers knew that the hydrogen sulfide release was caused by adding sulfuric acid to the contents of the open-air pit. The managers concluded that the neutralization process should cease until they had completed an evaluation of the situation. By the end of the day shift, the evaluation had not been completed. But because the pit could not be emptied and liquid condensate from the refining process continued to flow into the pit throughout the day, it was almost overflowing when the night-shift began.

¶14 The day-shift supervisor met with the night-shift supervisor prior to the shift change. He informed the night-shift supervisor of the events that had transpired because of the neutralization process in the open-air pit, including the fact that alarms had sounded and that workers in the refinery became ill. The day-shift supervisor expressed concern about adding additional sulfuric acid to the pit during the night shift. He testified that the hydrogen sulfide release was a dangerous event and that the night-shift supervisor "should have had a clear expectation not to continue" the neutralization process.

¶15 During the shift change, the day-shift pit operator also told the night-shift pit operator, Ms. Helf, about the events that had transpired that day. He told Ms. Helf to call the night-shift supervisor before she did any work on the pit to make sure that it was authorized. Ms. Helf followed this advice and called the night-shift supervisor to inquire whether she should neutralize the contents of the pit. He told her to neutralize the pit. Ms. Helf asked again whether the night-shift manager was sure that she should add sulfuric acid to the pit and he confirmed that she should do so.

¶16 Pursuant to this instruction, Ms. Helf opened both the compressed air valve and the valve that released sulfuric acid in the pit. As had happened earlier during the day shift, the sulfuric acid reacted violently with the sludge that had been dumped in the pit,

releasing hydrogen sulfide gas. But unlike the experienced day-shift operator who stood upwind from the pit, Ms. Helf, who was a new three-month trainee, did not take such a precaution. Instead, Ms. Helf walked along the perimeter of the pit from the south side to the east side. While she was walking along the eastern edge of the pit, she was "hit" by a cloud of toxic vapors from the pit that enveloped her. Ms. Helf's throat and chest seized and she fell to her knees. She then crawled to the north side of the pit and vomited. She believes that she lost consciousness at some point, but her memories of her exposure to the concentrated cloud of hydrogen sulfide gas are hazy and indistinct. As Ms. Helf was recovering, she received a radio call from the central control office instructing her to turn off the compressed air roiling the pit because hydrogen sulfide gas was making workers in other areas of the refinery sick, and she complied.

¶17 Ms. Helf suffered permanent injuries caused by her exposure to concentrated hydrogen sulfide gas. She has a seizure disorder and problems with memory and coordination. Ms. Helf can no longer drive and activities such as cooking and taking a bath can be dangerous because of the potential for a seizure.

¶18 Ms. Helf applied for and received workers' compensation benefits for her injuries. Ms. Helf then filed a lawsuit against Chevron in January 2003. Chevron moved to dismiss the lawsuit, arguing that the exclusive remedy provision of the Workers' Compensation Act barred the suit. *See* UTAH CODE § 34A-2-105(1). The district court dismissed the lawsuit and Ms. Helf appealed.

¶19 This court reversed the district court. We held that the exclusive remedy provision does not bar a civil lawsuit where the employer knew or expected that a worker would be injured. *Helf v. Chevron U.S.A., Inc.*, 2009 UT 11, ¶ 43, 203 P.3d 962. We further concluded that because Ms. Helf's complaint alleged that Chevron's managers knew that prior efforts to neutralize the contents of the pit had resulted in poisonous gases that set off safety alarms and caused workers far away from the pit to become ill, a reasonable jury could conclude that the managers knew or expected that Ms. Helf would be injured when she reinitiated the same process. *Id.* ¶¶ 44–46.

¶20 After the case was remanded and the parties had conducted discovery, Chevron moved for summary judgment, arguing that (1) Ms. Helf had not produced evidence that Chevron's managers knew or expected that Helf would be injured and that (2) the lawsuit was barred by the doctrine of election of remedies because Ms. Helf had chosen to accept workers' compensation benefits for her injuries. The district court rejected Chevron's election of remedies argument, but it granted summary judgment in favor of

Chevron because it found that Ms. Helf had failed to produce evidence that would create a dispute of material fact as to whether a Chevron manager knew or expected that Ms. Helf would be injured when she neutralized the pit.

¶21 Ms. Helf appealed from the summary judgment against her. Chevron also filed a notice of appeal in which it purported to cross-appeal from the portion of the judgment that rejected its election of remedies argument. In the briefing on the appeal and cross-appeal the parties have raised two main issues: (1) whether there was a dispute of material fact that would preclude summary judgment and (2) whether the election of remedies doctrine bars Ms. Helf's lawsuit

**ANALYSIS**

**I. SUMMARY JUDGMENT**

¶22 Workers may not sue their employers for injuries caused by on-the-job accidents. The exclusive remedy for work-related accidents is the workers' compensation scheme, which was created by the legislature to distribute benefits to injured workers. UTAH CODE § 34A-2-105(1). A worker, however, may sue an employer for injuries caused by an intentional tort. *Helf v. Chevron U.S.A., Inc.*, 2009 UT 11, ¶ 18, 203 P.3d 962.

¶23 In order to prevail in a civil lawsuit, therefore, a worker must prove that an agent of the employer intentionally caused the worker's injury. In other words, the worker must show that the employer's agent had "a specific mental state in which the [agent] knew or expected that injury would be the consequence of his action." *Id.* ¶ 43. This mental state can be proven either (1) with evidence that the agent "desired the consequences of his actions" or (2) with evidence that the agent acted with the knowledge that "the consequences were virtually certain to result" *Id.*

¶24 Ms. Helf does not allege that anyone at Chevron maliciously desired to injure her. Instead, she alleges that her supervisors knew that an injury was virtually certain to occur when they either directed or allowed her to neutralize the contents of the open-air pit. Chevron asserted in its motion for summary judgment that Ms. Helf had not produced evidence creating a dispute of fact as to whether a Chevron manager acted with this knowledge.

¶25 In order to decide whether the district court erred when it agreed with Chevron and granted summary judgment in its favor, we must answer three questions. First, we must decide precisely who at Chevron must have the required mental state in order for

Ms. Helf to prevail. Second, we must evaluate whether the district court erred when it excluded evidence in ruling on the summary judgment motion. And third, we must determine whether the district court correctly decided that Ms. Helf failed to produce admissible evidence that could support the conclusion that one of her supervisors had the mental state required for an intentional tort claim.

### A. At Least One Individual with the Authority to Direct Ms. Helf's Actions Must Have the Requisite Mental State in Order for Ms. Helf to Prevail

¶26 Ms. Helf urged the district court to aggregate the knowledge of various Chevron employees to determine whether the requisite knowledge to support an intentional tort claim could be imputed to Chevron. The court rejected this collective knowledge theory and concluded that the expectation that an injury was virtually certain to occur had to be found in the mind of at least one individual. The district court further concluded that only the knowledge of the night-shift supervisor was relevant in this case because he was the Chevron manager who instructed Ms. Helf to perform the neutralization process. These two conclusions are legal determinations that we review de novo. *See Daniels v. Gamma W. Brachytherapy, LLC,* 2009 UT 66, ¶ 46, 221 P.3d 256 (interpretation of the common law reviewed for correctness).

¶27 We agree with the district court's first conclusion that Ms. Helf must produce evidence that at least one individual with the authority to direct her actions had the required knowledge or expectation that she would be injured. Although we have never addressed this question, other courts have held that the collective knowledge of multiple employees cannot "establish the state of mind requisite to the commission of an intentional tort of a corporation." *Adams v. Nat'l Bank of Detroit,* 508 N.W.2d 464, 469, 480 (Mich. 1993). Put simply, "intent to commit tortious acts cannot be imputed to a corporation on the basis of disconnected facts possessed by various employees or agents of that corporation, where there is no evidence that any employee possessed the requisite state of mind." *Id.* at 480; *accord Woodmont, Inc. v. Daniels,* 274 F.2d 132, 137 (10th Cir. 1959) ("[W]hile in some cases, a corporation may be held constructively responsible for the composite knowledge of all of its agents . . . we are unwilling to apply the rule to fix liability where, as here, intent is an essential ingredient of tort liability as for deceit."); *see also Chaney v. Dreyfus Serv. Corp.,* 595 F.3d 219, 241 (5th Cir. 2010) ("[A]s a general rule, where an essentially subjective state of mind is an element of a cause of action we have declined to allow this

element to be met by a corporation's collective knowledge, instead requiring that the state of mind actually exist in at least one individual . . . ." (internal quotation marks omitted)); *First Equity Corp. of Fla. v. Standard & Poor's Corp.*, 690 F. Supp. 256, 259–60 (S.D.N.Y. 1988) (the collective knowledge of various employees may not be used to satisfy the scienter requirement of a fraud claim against a corporation).

¶28    Although it may be possible that the collective knowledge of the agents of a corporation may be relevant in other legal contexts, *see* RESTATEMENT (THIRD) OF AGENCY § 5.03 cmt. c (2006), we agree that for the purposes of proving that a corporation is liable for an intentional tort, a plaintiff must prove that at least one agent of the corporation had all of the requisite knowledge to support the claim. Inventing a corporate consciousness with the capacity to possess the state of mind necessary for an intentional tort is inconsistent with the principles of tort law. *See Adams*, 508 N.W.2d at 480. Therefore, the district court correctly concluded that at least one Chevron agent must have all of the knowledge necessary to support liability under an intentional tort theory.

¶29    The district court erred, however, in concluding that only the state of mind of Ms. Helf's direct supervisor could be relevant. If a more senior Chevron manger with the authority to direct Ms. Helf's actions knew or expected that workers would be injured during the neutralization process and either instructed the night-supervisor to order a worker to neutralize the pit or knew that the routine neutralization process would occur absent the manager's order to halt the process, then the knowledge of the more senior manager would be sufficient to support an intentional tort claim. Employers are not shielded from liability if a manager with the knowledge that an injury is virtually certain to occur simply orders another manager without this knowledge to instruct a worker to perform the dangerous task. Furthermore, if a manager knows or expects that a routine task will result in injury because of changed conditions, an employer does not avoid liability if that manager passively permits the worker's direct supervisor to instruct the worker to perform the task. Otherwise, employers would be encouraged to compartmentalize knowledge about dangerous conditions in order to insulate themselves from liability in situations where a more senior supervisor knows that an injury is virtually certain to occur but the direct supervisor does not have this knowledge.

¶30    Ms. Helf argued below and before this court that the knowledge of two of Chevron's senior managers was also relevant to

the question of Chevron's liability. Ms. Help produced evidence that both the area supervisor of the portion of the refinery where she worked and the emergency response team coordinator knew that reinitiating the neutralization process would be dangerous. The district court erred by not considering whether Ms. Help produced sufficient evidence that either of these individuals (1) knew that an injury was virtually certain to occur if a worker neutralized the pit, (2) had the authority to halt the neutralization process or direct the pit operator's actions, and (3) either ordered the routine neutralization process to continue or knew that a worker would neutralize the pit during the night shift and failed to stop it or require additional safety precautions.

### B.  *The Trial Court Erred When It Excluded Deposition Testimony*

¶31    Before determining whether Ms. Help should survive summary judgment because she produced evidence creating a dispute of material fact as to the elements of her claim against Chevron, we must first decide what evidence should have been considered by the district court. Specifically, we must determine whether the district court properly excluded portions of the deposition testimony of a union safety representative who investigated the accident.

¶32    During discovery, a union safety representative for the refinery gave deposition testimony about his investigation of the accident. The safety representative testified that he interviewed the day-shift supervisor and that the day-shift supervisor said that he told the night-shift supervisor about the hydrogen sulfide release, including the fact that some of the workers at the refinery got sick:

> [The day-shift supervisor] told [the night-shift supervisor] what they had tried, what had happened, the alarms that went off, people that got sick . . . . He just made him aware of what happened that day, that they got so many complaints of the odor, people getting sick and the alarms, that they shut it down.

This testimony is significant because it appears to be the only direct evidence that the day-shift supervisor informed the night-shift supervisor that the neutralization process made workers ill.

¶33    Chevron made no objection to this testimony during the deposition. But it later filed a written motion to strike this testimony, arguing that it was hearsay and that the declarant lacked personal knowledge. At the summary judgment hearing, the district court rejected Chevron's hearsay and lack of personal knowledge

arguments for excluding the testimony.[1] But the court sua sponte excluded the testimony on the grounds that it lacked foundation and was nonresponsive to the question asked. Based upon its conclusion that Ms. Helf had not produced admissible evidence that the night-shift supervisor knew that workers had been sickened by the neutralization process during the day shift, the district court granted the motion for summary judgment.

¶34   Ms. Helf argues on appeal that the district court erred by excluding this testimony because Chevron waived any foundation or nonresponsiveness objection by failing to raise it during the deposition. Two provisions of the Utah Rules of Civil Procedure govern the waiver of objections to deposition testimony not raised during a deposition. We review the district court's interpretation of these rules de novo. *See Pete v. Youngblood*, 2006 UT App 303, ¶ 7, 141 P.3d 629.

¶35   First, rule 32(c)(3)(A) provides that "[o]bjections to . . . the competency, relevancy, or materiality of testimony are not waived by failure to make them before or during the taking of the deposition, unless the ground of the objection is one which might have been obviated or removed if presented at that time." This rule applies to the foundation objection since it is an objection to the competency of the safety representative's testimony. A foundation objection is one of the types of objections to competency that is waived if not raised at the deposition because this objection can be "obviated or removed" by laying a foundation for the deponent's testimony. *See Jordan v. Medley*, 711 F.2d 211, 218 (D.C. Cir. 1983) (interpreting the nearly identical federal rule and holding that "[w]hat the exception obviously envisions is a situation in which a timely objection (*e.g.,* on the ground of failure to lay an adequate foundation) could have enabled the problem to be remedied" (citation omitted)); *Strelecki v. Firemans Ins. Co. of Newark*, 276 N.W.2d 794, 799 (Wis. 1979) (interpreting the nearly identical Wisconsin rule and holding that "objections which might be 'obviated or removed' . . . . include objections based on lack of foundation testimony").

¶36   Second, rule 32(c)(3)(B) states that "[e]rrors and irregularities occurring at the oral examination . . . *in the form of the questions or answers* . . . and errors of any kind which might be obviated, removed, or cured if promptly presented are waived

---

[1] Chevron has not challenged the district court's ruling rejecting its hearsay and lack of personal knowledge objections to the deposition testimony. Therefore this ruling is not before us in this appeal.

unless seasonable objection thereto is made at the taking of the deposition." (Emphasis added). This provision applies to the district court's sua sponte objection that the deposition testimony was nonresponsive to the question asked.

¶37   Thus the plain language of rules 32(c)(3)(A) and (B) dictates that the foundation and nonresponsiveness objections raised by the district court were waived because the objections could have been cured during the deposition. The district court apparently recognized the waiver problem, but justified its sua sponte exclusion of the testimony because a Chevron attorney asked the question that elicited the allegedly objectionable testimony: "Now, if it was not [Chevron's attorney] that was asking the questions and it would be – – if it were the other side and it was his obligation to object, those objections may well have been waived by the failure to make them at the deposition." The court, therefore, ruled that the foundation and nonresponsiveness objections were not waived because the party asking a deposition question has no obligation to raise an objection to a deponent's answer in order to avoid waiver of the objection.

¶38   The district court's ruling that the waiver rule did not apply was in error. Nothing in rule 32(c)(3)(A) or (B) indicates that the party posing a deposition question has no obligation to object to the deponent's answer in order to avoid waiver. Both rules speak in general terms and require waiver of certain types of objections if neither party asserts them during the deposition.

¶39   Caselaw examining the nearly identical federal rule indicates that the waiver rule applies regardless of which party is questioning the deponent when an objectionable answer is given. In *Kirschner v. Broadhead*, an attorney for the plaintiff deposed a defendant, who gave objectionable answers that were unresponsive to the questions asked. *See* 671 F.2d 1034, 1038 (7th Cir. 1982). Even though the plaintiff's attorney did not object to this testimony at the deposition, the plaintiff successfully moved for the exclusion of the deposition testimony at a subsequent trial where the deponent was unavailable to testify. *Id.* The Seventh Circuit held that the exclusion of the deposition testimony was erroneous because any objection was waived when the attorney questioning the deponent neglected to object to the deponent's answers during the deposition on the ground that the answers were nonresponsive. *Id.* The court reasoned that if the plaintiff's attorney, who was questioning the deponent, had objected to the form of the deponent's responses, the deponent could have "conformed his answers to the questions." *Id.* "The limited nature of such answers, in turn, would have alerted [defendants'] counsel to develop omitted portions of the story on

cross-examination. Because [plaintiff's counsel] did not object, [the defendants] very properly considered [the deponent's] in depth narrative sufficient for their purposes and thus dispensed with questions of their own." *Id.*

¶40 The same logic applies to this case. Had Chevron objected to the safety representative's answer on the grounds raised by the district court (lack of foundation and nonresponsive to the question asked), Ms. Helf would have been alerted to the potential need to cure the objection by laying a foundation and asking appropriate questions to elicit the same testimony when it was her attorney's turn to cross-examine the witness. As noted above, both of these objections are the type of objections that can be cured if they had been presented at the deposition. *Supra* ¶¶ 35–36. But because Chevron did not object, Ms. Helf could justifiably rely on the rule that the safety representative's deposition testimony could not be excluded based upon a later objection that could have been remedied had it been raised during the deposition.[2] If rules 32(c)(3)(A) and (B) were not applied where the party asking the deposition questions fails to object to the answers, "counsel would be encouraged to wait . . . before making any objections, with the hope that the testimony, although relevant, would be excluded altogether." *Kirschner*, 671 F.2d at 1038 (internal quotation marks omitted). This is precisely the unjust result the waiver rule is designed to prevent.

¶41 In its appellate briefing, Chevron does not argue that the trial court's interpretation of rule 32(c)(3)(A) and (B) was correct. Instead, it argues that we should not review the district court's sua sponte ruling excluding the deposition testimony because Ms. Helf did not object to the ruling after the court announced it during the summary judgment hearing. The preservation rule, however, does not counsel against appellate review of the district court's order.

¶42 "An issue is preserved for appeal when it has been presented to the district court in such a way that the court has an

---

[2] If the waiver rule did not apply where the attorney asking the deposition questions had cause to object to the deponent's answers but neglects to do so, the attorney for the opposing party would have to replicate the all of the deponent's answers on cross-examination or risk the exclusion of the deponent's testimony at a later date on an objection that was curable, but not raised during the deposition. Failing to apply rule 32(c)(3)(A) and (B) in this scenario would therefore lead to uncertainty, longer depositions, and increased litigation costs.

opportunity to rule on [it]." *Patterson v. Patterson*, 2011 UT 68, ¶ 12, 266 P.3d 828 (alteration in original) (internal quotation marks omitted). The fundamental purpose of the preservation rule is to ensure that the district court had a chance to rule on an issue before an appellate court will address it. This rule promotes both judicial economy and fairness to the parties. *Id.* ¶¶ 15–16. Where a district court itself raises and then resolves an issue sua sponte, it obviously had an opportunity to rule on the issue. This satisfies the basic purpose of the preservation rule.[3]

¶43 Rule 103(a) of the Utah Rules of Evidence confirm that an objection to the district court's ruling excluding evidence was not required to preserve the issue for appeal. Rule 103(a) describes the requirements for preserving a claim of error to an evidentiary ruling, listing separate requirements for a ruling admitting evidence and a ruling excluding evidence. A claim of error regarding a ruling admitting evidence is preserved if a party (1) "timely objects or moves to strike" and (2) "states the specific ground, unless it was apparent from the context." UTAH R. EVID. 103(a)(1). In order to preserve a claim of error regarding a ruling excluding evidence, however, a party need only "inform[] the court of [the substance of the excluded evidence] by an offer of proof, unless the substance was apparent from the context." UTAH R. EVID. 103(a)(2). No objection is needed to review a claimed error in excluding evidence. This comports with the underlying principles of the preservation rule because in order to exclude evidence, a district court must either sustain an objection raised by a party or raise an objection to the admission of the evidence sua sponte. In either situation the court must consider and rule on the issue.

¶44 Thus, because Ms. Helf seeks review of a ruling excluding evidence, and the substance of this evidence is apparent on the record, this issue is preserved for review. In reviewing this evidentiary ruling, we conclude that the district court erred by excluding a portion of the deposition testimony of the union safety representative because the objections raised by the court had been waived. We therefore consider this deposition testimony, including the assertion that the night-shift supervisor knew that the

---

[3] Indeed, we have noted that where one party raises an issue and induces the trial court to rule on it, the opposing party need not raise an objection in order to preserve the issue for appeal. *Gressman v. State*, 2013 UT 63, ¶ 45, 323 P.3d 998. There is no principled reason why there should be a different result where the court raises the issue of its own accord.

neutralization process made workers ill, in considering whether summary judgment was appropriate.

> *C. There Is a Dispute of Material Fact as to Whether the Night-Shift Supervisor Knew or Expected that Ms. Helf Would Be Injured*

¶45    Having resolved both the legal issue of who at Chevron must have the requisite state of mind to support an intentional tort claim and the evidentiary question of what proof of this state of mind was properly before the district court, we now turn to the question of whether summary judgment was proper here.

¶46    Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." UTAH R. CIV. P. 56(c). In determining whether there is a genuine issue of material fact, courts must "view the facts and all reasonable inferences in the light most favorable to the nonmoving party." *Bodell Const. Co. v. Robbins*, 2009 UT 52, ¶ 16, 215 P.3d 933. "We review [a] district court's summary judgment ruling for correctness, granting no deference to its legal conclusions, and consider whether it correctly concluded that no genuine issue of material fact existed." *Johnson v. Hermes Assocs., Ltd.*, 2005 UT 82, ¶ 12, 128 P.3d 1151.

¶47    The district court granted summary judgment in favor of Chevron based upon its determination that Ms. Helf failed to produce evidence that would create a dispute of material fact as to whether the night-shift supervisor knew that an injury was virtually certain to occur when he ordered her to neutralize the pit. Thus the key issue in the summary judgment proceeding was the night-shift supervisor's knowledge regarding the consequences of his order.[4] Absent an admission from the night-shift supervisor that he knew an injury would result—a concession he did not make in his deposition and, indeed, a concession we expect to be rare in these types of cases—this knowledge can only be inferred from the surrounding circumstances.[5] The question here, therefore, is this: viewing the

---

[4] As noted above, Ms. Helf also argued that Chevron's liability could also be based on the knowledge of two other managers. *Supra* ¶ 30. Because the proceedings in the district court and the briefing before this court focused on the evidence related to the night-shift supervisor's knowledge, we first examine the evidence of his knowledge.

[5] *See State v. Lamm*, 606 P.2d 229, 235 (Utah 1980) (Maughan, J., dissenting) ("This Court has repeatedly recognized the basic concept that criminal intent is rarely susceptible to direct proof and usually must be inferred from the facts and circumstances of the incident.");

evidence of the facts known by the night-shift supervisor in the light most favorable to Ms. Helf, could a reasonable jury infer that the supervisor also knew that an injury was virtually certain to result from his command to neutralize the pit?[6]

¶48 Taken in the light most favorable to Ms. Helf, the evidence and all reasonable inferences drawn from it would support a jury conclusion that the night-shift supervisor knew that adding sulfuric acid to the pit would release dangerous quantities of hydrogen sulfide gas. He was told that during the day shift the neutralization process had triggered sensors designed to detect dangerous levels of hydrogen sulfide gas that were located 150 feet from the pit and that emergency alarms had sounded. He was also told that hydrogen sulfide gas from the neutralization process caused workers in other areas of the refinery to become ill. The day-shift supervisor expressed his concern about adding sulfuric acid to the pit to the night-shift supervisor. The day-shift supervisor further testified that the hydrogen sulfide release was a dangerous event and that the night-shift supervisor "should have had a clear expectation not to continue" the neutralization process.

¶49 Given this evidence of the night-shift supervisor's knowledge, a reasonable jury could infer that he also knew or expected that an injury would occur when he told Ms. Helf to neutralize the pit. The night-shift supervisor knew that the same

---

*Selvage v. J.J. Johnson & Assocs.*, 910 P.2d 1252, 1262 n.9 (Utah Ct. App. 1996) (citing a case observing that "intent can rarely be established directly, and therefore circumstantial evidence must be examined as to the circumstances surrounding the transactions in question"); *Alexander v. Bozeman Motors, Inc.*, 234 P.3d 880, 887 (Mont. 2010) (examining a worker's intentional tort claim against an employer and noting that "[b]ecause it is seldom subject to direct proof, intent must be inferred" from surrounding circumstances (internal quotation marks omitted)).

[6] In order for the injury to be intentional, the night-shift supervisor did not have to anticipate the extent or exact nature of Ms. Helf's actual injury. "As long as some sort of injury was intended or expected, the actual injury suffered is not accidental even if the actual injury differs in nature or degree from what might have been reasonably anticipated." *N.M. ex rel. Caleb v. Daniel E.*, 2008 UT 1, ¶ 12, 175 P.3d 566. So long as the supervisor knew that some "nontrivial injury" was virtually certain to occur when he directed Ms. Helf to neutralize the pit, the resulting injury is intentional. *See id.*

neutralization process had caused emergency alarms to sound and made workers in other areas of the refinery to become sick during the day shift. A jury could conclude that since hydrogen sulfide gas triggered sensors located 150 feet from the pit and made distant workers ill, the night-shift supervisor knew that Ms. Helf, who was working right next to the pit, would be injured.

¶50   We indicated as much the last time this case appeared before us. We held in *Helf* that allegations in the complaint that the day-shift neutralization process had triggered safety alarms and caused workers in other areas of the refinery to become ill were sufficient to survive a motion to dismiss. 2009 UT 11, ¶¶ 44–46. These allegations "could convince a reasonable jury that [Ms. Helf's] injuries were the expected result of re-initiating the neutralization process." *Id.* ¶ 46. Because Ms. Helf produced evidence to substantiate these key allegations, we hold that Ms. Helf's lawsuit survives Chevron's motion for summary judgment.

¶51   Other courts have held that similar facts raised a jury question as to whether a worker's supervisor knew that an order would cause an injury, rejecting motions for summary judgment brought by the employer. *Gulden v. Crown Zellerbach Corp.*, 890 F.2d 195, 197 (9th Cir. 1989) (reversing summary judgment on a worker's intentional tort claim where there was evidence that a supervisor ordered the worker's contact with a toxic substance); *O'Brien v. Ottawa Silica Co.*, 656 F. Supp. 610, 611 (E.D. Mich. 1987) (refusing to grant summary judgment where the employer's doctors discovered evidence of respiratory disease but the employer did not inform the worker of this evidence or take precautions to avoid further inhalation of asbestos); *Suarez v. Dickmont Plastics Corp.*, 639 A.2d 507, 512–13 (Conn. 1994) (reversing summary judgment where the worker was ordered to clean a machine without shutting it down); *Kachadoorian v. Great Lakes Steel Corp.*, 424 N.W.2d 34, 36–37 (Mich. Ct. App. 1988) (reversing summary disposition where a supervisor ordered a worker to drive a machine under a vessel that frequently spilled molten steel); *Kielwein v. Gulf Nuclear, Inc.*, 783 S.W.2d 746, 747–48 (Tex. App. 1990) (reversing summary judgment where a supervisor instructed a worker to decontaminate an area where highly radioactive isotopes had been spilled without safety equipment). In reversing summary judgment in a similar case involving an intentional tort claim brought by worker, the Ninth Circuit noted that "[s]ummary judgment is particularly inappropriate where the inferences which the parties seek to have drawn deal with questions of motive, intent and subjective feelings and reactions." *Gulden*, 890 F.2d at 197 (internal quotation marks

omitted). Given that the key dispute here is over the subjective knowledge of the night-shift supervisor, we are similarly reluctant to say that in our wisdom we have divined the only reasonable inference that a jury may draw from the available evidence. That question, at least under the facts of this case, is for the jury.

¶52    The district court, though, granted summary judgment in favor of Chevron mainly based upon the fact that the day-shift pit operator had not been injured when he neutralized the pit:

> I think it's significant that there's no indication that [the day-shift pit operator] was sick or injured, which I think that fact alone . . . has greater significance than either of the parties have pointed to, because if the standard is that a specific employee was going to be injured during a specific task, the fact that the very person that performed the task on the shift before did not get injured, it raises a question about whether that standard could be met under the circumstances of this case.

But the absence of an injury to the worker that neutralized the pit prior to Ms. Help does not mandate summary judgment in favor of Chevron for two reasons.

¶53    First, there is no evidence that the night-shift supervisor knew that the day-shift pit operator was not among the Chevron employees who became ill when the pit was neutralized during the day shift. The day-shift supervisor did not testify that he had conveyed this information to the night-shift supervisor. Nor is there any other direct evidence that the night-shift supervisor had this knowledge. The day-shift supervisor did testify, however, that he conveyed "all significant and important information" to the night-shift supervisor. From this testimony, a jury could potentially infer that the night-shift supervisor had been informed about the absence of any injury to the day-shift pit operator. But in a summary judgment proceeding, courts must make all inferences in favor of the nonmoving party—in this case, Ms. Help. *Bodell Const.*, 2009 UT 52, ¶ 16. Chevron, as the moving party, is not entitled to inferences in its favor when seeking summary judgment.

¶54    As we noted above, only the knowledge of the night-shift supervisor when he directed Ms. Help to neutralize the pit is relevant to the question of whether he knew that Ms. Help would be injured. *Supra* ¶ 26–28, 47. Because we may not assume that the night-shift supervisor knew that the day-shift pit operator was not injured by

the neutralization process, this fact has no bearing on the question of whether summary judgment was appropriate in this case.

¶55    Second, even if the absence of an injury to the day-shift pit operator were relevant, this fact does not defeat summary judgment. If the night-shift supervisor knew that the day-shift pit operator had not been injured, a jury could infer that differences between the experienced day-shift pit operator and the recently hired Ms. Helf would still lead to the conclusion that the night-shift supervisor expected Ms. Helf would be injured when she neutralized the pit.

¶56    The day-shift pit operator had over five years of experience working at the refinery. Because of his years of experience, he knew to immediately move away from the pit and stand upwind while neutralizing the caustic sludge contained in the pit. He had also learned from experience to hold his breath when approaching the pit to turn off the sulfuric acid valve in order to avoid breathing toxic fumes. Ms. Helf, on the other hand, had only worked at the refinery for three months. A jury could conclude, therefore, that the night-shift operator knew that Ms. Helf lacked the experience required to know to take such precautions when he ordered her to neutralize the pit.

¶57    In summary, the evidence supports the conclusion that Chevron's decision to dump the caustic sludge into the open-air pit left the night-shift supervisor with an array of bad options. If the supervisor did nothing, liquid condensate from the refining process that continuously flows into the pit would have caused the pit to overflow. This could lead to environmental cleanup costs and potential regulatory action against Chevron. The supervisor also presumably could also have shut down the portion of the refinery that produced the liquid condensate to prevent the pit from overflowing. But the resulting loss of production would hurt Chevron's bottom line. The supervisor instead chose a third option: to conduct business as usual and instruct Ms. Helf to neutralize the pit so that it could be pumped out and the refining process could continue unabated. A jury could conclude that the supervisor chose this course of action in order to serve the economic interests of Chevron or to avoid a negative employment action against himself. A jury could further conclude that the night-supervisor made this decision with the knowledge that Ms. Helf would be injured in the process. *See Helf*, 2009 UT 11, ¶¶ 34–37 (employer motivated by profits may be liable if the employer expected an injury to result from a course of action).

¶58    We therefore conclude that summary judgment was inappropriate. There is a dispute of material fact as to whether the

night-shift supervisor knew that Ms. Helf would be injured. Consequently, we need not consider whether Ms. Helf produced adequate evidence that one of the other Chevron managers had the requisite knowledge to sustain an intentional tort claim.

## II. ELECTION OF REMEDIES

¶59    Chevron argues in the alternative that even if Ms. Helf produced sufficient evidence to survive summary judgment, it was nevertheless entitled to judgment as a matter of law because Ms. Helf was bound by her election to receive the remedy of workers' compensation benefits for her injury. Chevron asserts in its briefing on the cross-appeal that the district court erred when it rejected this election of remedies argument and that we should affirm the summary judgment in its favor on this alternative ground. *See Jensen ex rel. Jensen v. Cunningham*, 2011 UT 17, ¶ 36, 250 P.3d 465 ("We may affirm a grant of summary judgment upon any grounds apparent in the record.").

¶60    We first consider whether Chevron properly used a cross-appeal as a vehicle to brief this argument. We then determine whether we made a binding resolution of this issue in this court's prior opinion in this case. Because we decide that the election of remedies issue is properly before us, we then decide whether this doctrine bars Ms. Helf's lawsuit.

### A. Chevron's Cross-Appeal

¶61    Litigants must cross-appeal "if they wish to attack a judgment of a lower court for the purpose of enlarging their own rights or lessening the rights of their opponent." *State v. South*, 924 P.2d 354, 355 (Utah 1996). "Conversely, if appellees . . . merely desire the affirmance of the lower court's judgment, they need not, and should not, cross-appeal . . . ." *Id.* at 356. Improper cross-appeals unnecessarily lengthen the briefing process, "multiply the number of briefs filed[,] and lead to confusion of the issues presented." *Id.*

¶62    Although Chevron filed a notice of cross-appeal from the summary judgment, it does not seek to enlarge its rights under the judgment or lessen the rights of Ms. Helf. Instead, Chevron seeks an affirmance of the summary judgment in its favor on an alternative ground that was rejected by the district court—that the election of remedies doctrine bars the suit. Appellees, however, may not use a cross-appeal as a vehicle for arguing for the affirmance a district court's judgment. Appellees must instead raise an alternative ground for affirmance in the briefing of the initial appeal.

¶63 We therefore dismiss Chevron's cross-appeal. But we shall consider Chevron's election of remedies argument found in the briefing on the cross-appeal.

*B. The Law of the Case Doctrine Does Not Prohibit this Court from Considering Chevron's Election of Remedies Argument*

¶64 "Under the law of the case doctrine, issues resolved by this court on appeal bind the trial court on remand, and generally bind this court should the case return on appeal after remand." *Gildea v. Guardian Title Co. of Utah*, 2001 UT 75, ¶ 9, 31 P.3d 543. When applied to this court after a case returns to us for a second time, this doctrine "is not an inexorable command that rigidly binds [this] court to its former decisions." *Id.* But we will not deviate from our prior decisions in a case unless we have good cause to do so. *See id.*

¶65 Of course in order for the law of the case doctrine to apply at all, this court must have actually decided the issue in a prior opinion. Ms. Help contends that we resolved the election of remedies issue in our previous opinion in this case, and that we should remain true to our prior decision. In our prior opinion, this court never so much as mentioned the election of remedies doctrine, much less decided the issue. In a short dissent, however, Justice Wilkins wrote that he would have affirmed the dismissal of the Ms. Help's case because her election to pursue workers compensation benefits prohibited further suit against her employer. *Help v. Chevron U.S.A., Inc.*, 2009 UT 11, ¶ 54, 203 P.3d 962 (Wilkins, J., concurring in part and dissenting in part). Ms. Help reasons, therefore, that this court implicitly rejected the position advocated by the dissent and that this implicit holding should bind the court in this appeal.

¶66 We disagree. Our silence on the election of remedies issue in our prior opinion was just that—silence. The court merely declined to address an issue that was not raised or briefed by parties in that appeal. The fact that one of the justices of this court wrote a separate opinion does not mean that the majority opinion contains an implicit holding that is diametrically opposed to the separate opinion. It simply means that the majority of the court made no holding on the issue. *See Peak Alarm Co. v. Werner*, 2013 UT 8, ¶ 11, 297 P.3d 592 (rejecting an argument that an opinion of this court contained an implicit holding where the opinion did not address or analyze the issue).

¶67 We conclude that the law of the case doctrine does not apply because we did not resolve the election of remedies issue in our prior opinion. We therefore address whether Ms. Help made a

binding election of remedies that bars her tort lawsuit when she applied for and received workers' compensation benefits.

*C. The Election of Remedies Doctrine Does Not Bar Ms. Helf's Lawsuit*

1. The Election of Remedies Doctrine

¶68    In its most basic terms, the election of remedies doctrine "prevent[s] double redress for a single wrong." *Angelos v. First Interstate Bank of Utah*, 671 P.2d 772, 778 (Utah 1983) (internal quotation marks omitted). If a defendant wrongfully retains possession of a plaintiff's cow, for example, the plaintiff may not recover both the cow *and* the reasonable value of the cow. The plaintiff must elect one of these two remedies.

¶69    The election of remedies doctrine also refers to a plaintiff's choice between legally or factually inconsistent theories of recovery for a single wrong. 25 AM. JUR. 2D *Election of Remedies* § 1 (2014). One common example of the application of this rule occurs when a plaintiff is not paid for services rendered to a defendant. The plaintiff may either recover damages for breach of contract or, if no valid contract governs the services provided, the plaintiff may recover the reasonable value of the services under a quantum meruit claim. *See* RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 31 cmt. e (2011). Because a breach of contract remedy requires a valid, enforceable contract, while a quantum meruit remedy presupposes that no contract governs the services provided, a plaintiff may recover only one of these two inconsistent remedies. *Reilly v. Natwest Markets Grp. Inc.*, 181 F.3d 253, 263–64 (2d Cir. 1999).

¶70    Thus, at its core, the election of remedies stands for the rather straight-forward principle that a plaintiff may not obtain either (1) a double recovery or (2) legally or factually inconsistent recoveries for the same wrong. The more difficult question is when a plaintiff should be deemed to have made an irrevocable election between available remedies or theories of recovery.

¶71    Where a plaintiff must choose between alternative remedies for a single theory of liability, an election is not final until a judgment is fully satisfied. *Farmers & Merchs. Bank v. Universal C.I.T. Credit Corp.*, 289 P.2d 1045, 1049 (Utah 1955). Courts treat this type of election as a choice between consistent remedies because the remedies do not rest upon irreconcilable factual or legal theories. *See id.* Thus if a plaintiff obtains a judgment authorizing a writ of replevin for the return of a cow wrongfully obtained by a defendant, the election is not final until the cow is returned. If the plaintiff later discovers that the cow had died while in the defendant's possession, the plaintiff may still pursue a claim for payment of the reasonable

value of the cow. *See Largilliere Co., Bankers, v. Kunz,* 244 P. 404, 404–05, 406 (Idaho 1925) (permitting a plaintiff to simultaneously pursue both a claim for damages for the conversion of a flock of sheep and a writ of replevin for the return of the sheep "until a satisfaction of its demand is obtained" because these two remedies are consistent).

¶72    If a plaintiff must choose between inconsistent theories of liability, on the other hand, older cases held that a plaintiff makes a binding election between these theories of liability upon filing a complaint based upon one of these conflicting theories. *Cook v. Covey-Ballard Motor Co.,* 253 P. 196, 199–200 (Utah 1927); *Howard v. J.P. Paulson Co.,* 127 P. 284, 286 (Utah 1912). Commentators and courts alike have long criticized this antiquated version of the election of remedies doctrine, however, noting that this rule is unduly harsh to plaintiffs "and frequently results in injustice." Charles P. Hine, *Election of Remedies, A Criticism*, 26 HARV. L. REV. 707, 707 (1913); *see also id.* at 719 ("The modern rule of election of remedies is a weed which has recently sprung up in the garden of the common law, its roots stretching along the surface of *obiter dicta* but not reaching the subsoil of principle. The judicial gardeners through whose carelessness it has crept in should be able to eliminate it, or at least to prevent its further growth."); *Bernstein v. United States*, 256 F.2d 697, 705 (10th Cir. 1958) ("[The election of remedies doctrine] has been consistently criticized as harsh and not a favorite of equity."); *Waffer Int'l Corp. v. Khorsandi*, 82 Cal. Rptr. 2d 241, 251 (Ct. App. 1999) ("Courts and commentators have long recognized the harshness of the election of remedies doctrine and have for some time looked upon it with disfavor." (internal quotation marks omitted)).

¶73    The harshness of this branch of the election of remedies doctrine in the nineteenth century and early twentieth century rested upon the strict pleading requirements of the time. During this period, several jurisdictions still followed the common law rule prohibiting pleadings in the alternative, although the trend was toward permitting alternative pleadings. Gregory Hankin, *Alternative and Hypothetical Pleadings*, 33 YALE L.J. 365, 365–67, 369 (1924); *see also* Note, *Election of Remedies: A Delusion?*, 38 COLUM. L. REV. 292, 314 (1938). Other jurisdictions did not permit plaintiffs to amend their complaint to plead an alternative theory of recovery. Note, *Election of Remedies: A Delusion?*, 38 COLUM. L. REV. 292, 312–14 (1938). These pleading rules, combined with a strict application of the election of remedies doctrine, required plaintiffs to choose at their peril between inconsistent theories of recovery when initiating a lawsuit.

¶74    The advent of liberal pleading rules, however, has eliminated this harsh interpretation of the election of remedies doctrine. *See Bernstein*, 256 F.2d at 706 ("Whatever may be said for the common law doctrine of election of remedies before the advent of the Federal Rules of Civil Procedure, we are certain that there is no room for its application under applicable rules of procedure . . . ."). Utah's modern pleading rules permit litigants to plead inconsistent theories of recovery in the alternative. UTAH R. CIV. P. 8(e) ("A party may state a claim or defense alternately or hypothetically . . . ."); *see also Ripple v. Wold*, 549 N.W.2d 673, 675 (S.D. 1996) ("'The election doctrine does not apply to preclude the plaintiff from pursuing inconsistent theories or even inconsistent factual assertions. Modern procedure permits alternative and inconsistent claims and also alternative and inconsistent defenses.'" (quoting DAN B. DOBBS, LAW OF REMEDIES § 9.4 (2d Ed. 1993)). Plaintiffs may even amend an initial pleading to add inconsistent theories of recovery if given permission to do so by the district court, which "shall be freely given when justice so requires." UTAH R. CIV. P. 15(a); *see also Smith v. Grand Canyon Expeditions Co.*, 2003 UT 57, ¶ 32, 84 P.3d 1154 ("In Utah, rule 15 is interpreted liberally to allow parties the opportunity to fully adjudicate their claims on the merits.").

¶75    In the 1957 case, *Parrish v. Tahtaras*, we recognized that these liberal pleading rules obviated the former rule that a plaintiff's election among inconsistent remedies in a complaint is irrevocable. 318 P.2d 642, 645 (Utah 1957). In that case, an architect sued the defendants under a breach of contract theory to recover for services rendered. *Id.* at 644. At a bench trial, however, the court awarded damages under a quantum meruit theory after granting a motion to amend the complaint to conform to the proof. *Id.* We held that "[t]he alternate remedies [of breach of contract or in quantum meruit], although formerly limited by a strict election doctrine, may be pleaded in alternative form and may even be inserted by amendment late in the proceedings." *Id.* at 645. Therefore, "[i]t was not error for the trial judge to allow amendment late in the proceedings to show this alternative plea, the defendants not being in any way prejudiced by the ruling." *Id.*

¶76    In a later case, we confirmed that modern pleading rules dictate that a court may not require a plaintiff to elect between inconsistent claims prior to trial:

> Rule 8(e) of our Rules of Civil Procedure permits either party to plead in the alternative, either in one count or defense, or in separate counts or defenses. To require a

party to make an election between the alternative counts or defenses, particularly at the pretrial stage of the proceedings, would be to emasculate the rule and render it meaningless.

*Rosander v. Larsen*, 376 P.2d 146, 146 (Utah 1962) (footnote omitted). This is in line with the modern view that a plaintiff may present inconsistent theories of liability at trial. *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996); 28A C.J.S. *Election of Remedies* § 6 (2008) ("[M]any cases hold that a party is not required to elect between remedies before the trial or during the course of the trial or before the conclusion of trial, or at the pleading stage; he or she may plead and litigate inconsistent remedies and submit different theories of recovery to the jury, and is not required to elect a remedy prior to the submission of the case to the jury or prior to the jury's verdict." (footnotes omitted)). Once the fact-finder and the judge have resolved all factual and legal disputes related to the inconsistent theories of liability, the plaintiff is then entitled to the one remedy (if any) that is supported by the final determination of the law and the facts. *Genetti v. Caterpillar, Inc.*, 621 N.W.2d 529, 546 (Neb. 2001) ("[A]lthough initially a buyer may present both theories and need not elect between them, the finding of either final acceptance or revocation of acceptance of nonconforming goods ultimately determines the available remedy." (internal quotation marks omitted)).

¶77 Thus unless another doctrine, such as estoppel,[7] dictates that a plaintiff's election among inconsistent remedies is final at an earlier stage of the litigation, an election is not binding "until one remedy is pursued to a determinative conclusion." *Christensen v. Eggen*, 577 N.W.2d 221, 224 (Minn. 1998) (emphasis omitted).

---

[7] "If a party has more than one remedy . . . his manifestation of a choice of one of them by bringing suit or otherwise is not a bar to another remedy unless the remedies are inconsistent and the other party materially changes his position in reliance on the manifestation." RESTATEMENT (SECOND) OF CONTRACTS § 378 (1981). One example of a situation where a plaintiff may be estopped from changing an election of remedies is where one party contracts to sell land to another party and the seller later repudiates the contract and the buyer sues for damages. If the seller relies upon the buyer's suit for damages to make valuable improvements to the land, the buyer may be estopped from amending the complaint to request specific performance of the purchase contract. *Id*. § 378 cmt. a, illus. 1.

2. Application of the Election of Remedies Doctrine Where a Worker Brings Both a Workers' Compensation Claim and an Intentional Tort Claim

¶78   In applying these general principles to this case, we must examine the remedies available to an injured worker. A worker injured on the job may potentially recover either worker's compensation benefits or intentional tort damages. These two remedies are inconsistent. Workers' compensation benefits are paid to workers injured by an "accident arising out of and in the course of the employee's employment." UTAH CODE § 34A-2-401(1). These benefits are the exclusive remedy for work-related accidents. *Id.* § 34A-2-105(1). In order to recover tort damages for an injury, on the other hand, a worker must prove that an injury was caused by an intentional tort rather than an accident. *Helf*, 2009 UT 11, ¶ 18. The question before this court, therefore, is when does an injured worker make a binding election between these two inconsistent remedies? Because this is a legal question, we review the district court's ruling on it de novo. *See Daniels v. Gamma W. Brachytherapy, LLC*, 2009 UT 66, ¶ 46, 221 P.3d 256.

¶79   If these two remedies could be pursued in a single forum, the answer would be simple. The worker could plead in the alternative that the injury was caused by either an accident or an intentional tort, and after the fact-finder made a final determination regarding the nature of the injury, the worker would elect the remedy available under the facts found by the jury or administrative body. The problem, of course, is that a worker may not pursue these two remedies in a single forum. The labor commission has exclusive jurisdiction to award workers' compensation benefits for accidents, while the district court has exclusive jurisdiction to award damages for an intentional tort. *See* UTAH CODE § 34A-2-112; *id.* § 78A-5-102(1).

¶80   Because these remedies must be adjudicated in separate forums, a strict application of the election of remedies doctrine presents injured workers with a cruel dilemma. If a worker choses to apply for and receives workers' compensation benefits, the worker may be deemed to have made a binding election of this remedy because the worker pursued it to a "determinative conclusion." *Christensen*, 577 N.W.2d at 224 (emphasis omitted). By accepting workers' compensation benefits for urgent financial needs, such as medical expenses or living expenses if the worker becomes disabled, a worker who may have been injured by an intentional tort would be barred from asserting a tort claim. If the worker instead elects to forego workers compensation benefits and gambles on an intentional tort claim, the worker would have to survive without any benefits,

and the burden of sustaining potentially protracted litigation, until the completion of the trial and inevitable appeal or appeals. This hardship would in most cases be extreme because any worker contemplating a lawsuit would likely be severely injured in order to justify the expense and stress of a lawsuit against a well-funded employer.

¶81    Moreover, if the lawsuit lasts longer than the statute of limitations for a workers' compensation claim, then the worker (or the worker's family if the worker was killed) will be denied *any* recovery for the injury if the lawsuit is unsuccessful. *See* UTAH CODE § 34A-2-417(1) (a worker typically has one year to seek compensation for a medical expense caused by the work-related injury); *id.* § 34A-2-417(2) (six-year statute of limitations for partial or total disability benefits); *id.* § 34A-2-417(3) (one-year statute of limitations for a claim for death benefits). Because of the one-year statute of limitations for the recovery of most medical expenses and death benefits under workers' compensation, at minimum, a worker or heir who chooses to pursue a tort remedy will almost certainly lose the ability to claim these benefits if the lawsuit is unsuccessful. Ms. Helf's lawsuit, for example, has lasted twelve years so far and she has not been able to bring her case to trial yet, much less the likely posttrial appeal. The duration of this litigation has already greatly surpassed the current statute of limitations for any type of workers' compensation benefit. Thus, under a strict application of the election of remedies doctrine, workers would risk losing both remedies if they make a bad guess as to which remedy was appropriate.

¶82    This interpretation of the election of remedies doctrine, similar to the much-criticized application of the doctrine in the early twentieth century, effectively requires an injured worker to choose at peril between inconsistent remedies at an unreasonably early stage in the litigation. Forcing this choice is especially harsh because of the difficulty of predicting the outcome of an intentional tort suit. Because the line between an accident and an intentional tort is based upon the subjective knowledge and intent of the worker's supervisors, which most often must be inferred from the surrounding circumstances, *see supra* ¶ 47 & n.5, the worker is in a poor position to evaluate the odds of success before a jury resolves this factual dispute.

¶83    There is a fairly even split of authority among state supreme courts as to whether the election of remedies doctrine requires workers to make this choice between workers compensation

benefits and a tort lawsuit.[8] By our count, eight state supreme courts have held that a final adjudication of a right to receive workers' compensation benefits constitutes a binding election that bars an intentional tort lawsuit.[9] But nearly as many state supreme courts (we found seven) have held that a worker may pursue both remedies and that the receipt of workers' compensation benefits does not act as a bar to the pursuit of a tort remedy.[10]

¶84    Many of the courts that have rejected a strict application of the election of remedies doctrine have reasoned that it would require the worker to make a "gambler's choice":

> Workmen's compensation is above all a security system; a strict election doctrine transforms it into a grandiose sort of double-or-nothing gamble. Such gambles are appealing to those who still think of the judicial process as a glorious game in which formal moves and choices are made at peril, and in which the ultimate result is spectacular victory for one side and utter defeat for the other. The stricken workman is in no mood for this kind of play, and should not be maneuvered into the necessity for gambling with his

---

[8] Some states have statutes that resolve this issue. An Arizona statute, for example, provides that if a worker accepts workers' compensation benefits, the right to initiate a lawsuit against the employer is waived. ARIZ. REV. STAT. § 23-1024. Oregon and West Virginia statutes, on the other hand, explicitly permit workers to accept benefits without waiving the right to sue the employer. OR. REV. STAT. § 656.156(2); W. VA. CODE § 23-4-2(c).

[9] *Gourley v. Crossett Pub. Sch.*, 968 S.W.2d 56, 58 (Ark. 1998); *Jones v. Martin Electronics, Inc.*, 932 So. 2d 1100, 1106–07 (Fla. 2006); *Collier v. Wagner Castings Co.*, 408 N.E.2d 198, 204 (Ill. 1980); *Advanced Countertop Design, Inc. v. Second Judicial Dist. Court ex rel. Cnty. of Washoe*, 984 P.2d 756, 759 (Nev. 1999); *Salazar v. Torres*, 158 P.3d 449, 456–57 (N.M. 2007); *Werner v. State*, 424 N.E.2d 541, 543–44 (N.Y. 1981); *Schlenk v. Aerial Contractors, Inc.*, 268 N.W.2d 466, 472 (N.D. 1978); *Kohler v. McCrory Stores*, 615 A.2d 27, 32 (Pa. 1992).

[10] *Elliott v. Brown*, 569 P.2d 1323, 1327 (Alaska 1977); *Suarez v. Dickmont Plastics Corp.*, 639 A.2d 507, 514–16 (Conn. 1994); *Dominguez ex rel. Hamp v. Evergreen Res., Inc.*, 121 P.3d 938, 942–43 (Idaho 2005); *Gagnard v. Baldridge*, 612 So. 2d 732, 735–36 (La. 1993); *Millison v. E.I. du Pont de Nemours & Co.*, 501 A.2d 505, 518–19 (N.J. 1985); *Woodson v. Rowland*, 407 S.E.2d 222, 233–34 (N.C. 1991); *Jones v. VIP Dev. Co.*, 472 N.E.2d 1046, 1054 (Ohio 1984).

rights, under the guise of enforcing a supposed penalty against the employer.

*Suarez v. Dickmont Plastics Corp.*, 639 A.2d 507, 515 (Conn. 1994) (internal quotation marks omitted); *accord Millison v. E.I. du Pont de Nemours & Co.*, 501 A.2d 505, 518–19 (N.J. 1985). Because most injured workers and their families are in no position to gamble on a tort remedy or wait out a lengthy and expensive litigation, the strict application of the election of remedies doctrine would effectively insulate employers from tort liability for intentionally caused injuries or death. *Suarez*, 639 A.2d at 515; *Jones v. VIP Dev. Co.*, 472 N.E.2d 1046, 1054 (Ohio 1984). Thus employers would not be discouraged from engaging in intentional misconduct and would "escape any meaningful responsibility for its abuses." *Jones*, 472 N.E.2d at 1054; *accord Woodson v. Rowland*, 407 S.E.2d 222, 233–34 (1991).[11]

¶85 We agree with the courts that have rejected a strict application of the election of remedies doctrine to injured workers. As one leading commentator has noted:

> [N]othing could be more foreign to the spirit and purpose of compensation legislation than the tricky and technical doctrine of election. With its origins in Roman law, and with its entire philosophy smacking of medieval legalism, it confronts the needy and often uneducated claimant not with the certainty of protection which compensation law exists to provide, but with a gambler's all-or-nothing choice.

10 ARTHUR LARSON & LEX K. LARSON, LARSON'S WORKERS' COMPENSATION LAW § 115.05 (2014). The election of remedies doctrine is a rule of "procedure or judicial administration." 25 AM. JUR. 2D *Election of Remedies* § 2 (2014). It is equitable in nature and is invoked "to the end that justice may be served." 28A C.J.S. *Election of Remedies* § 1 (2008). As an equitable judicial principle, the election of remedies doctrine should be applied to produce fair outcomes for litigants. It certainly applies to prevent the worker from obtaining a

---

[11] The Idaho Supreme Court reasoned instead that the election of remedies doctrine does not apply to injured workers who accept workers' compensation benefits because the "injury can be 'accidental' from the perspective of an employee while at the same time being intentional on the part of the employer." *Dominguez*, 121 P.3d at 942. We do not find this rationale persuasive because it is not the perspective of the worker or the employer that counts for the purposes of the election of remedies doctrine; it is the determination made by the fact-finder as to the nature of the injury.

double recovery or recovering two inconsistent remedies. But it should not be applied to force the worker to make a binding election before knowing how a jury will resolve an intentional tort claim.

¶86    The district court, therefore, correctly ruled that the election of remedies doctrine does not bar Ms. Helf's lawsuit against Chevron. To avoid a double recovery, however, if Ms. Helf eventually prevails, she may not retain the inconsistent remedies of workers' compensation benefits and an award for tort damages. In order to prevent an inconsistent recovery, a worker "who recovers civilly against his employer" may no longer receive workers' compensation benefits and must "reimburse the workers' compensation carrier to the extent the carrier paid workers' compensation benefits, or by permitting the carrier to become subrogated to the claimant's civil claim to the extent of benefits paid." *Woodson* 407 S.E.2d at 233; *see also Bryan v. Utah Int'l,* 533 P.2d 892, 894 (Utah 1975) (a worker who recovers damages in an intentional tort suit against a fellow employee must reimburse the party that paid workers' compensation benefits for the same injury).[12]

## CONCLUSION

¶87    We reverse the summary judgment in favor of Chevron and remand for further proceedings consistent with this opinion.

---

[12] Ms. Helf argues that the worker's compensation benefits she has collected may be used as an offset to reduce any amount she may recover from Chevron in her lawsuit to prevent a double recovery. This solution, however, would permit workers to recover two inconsistent remedies for the same injury—a partial recovery in the form of workers' compensation benefits and a partial recovery for tort damages. The election of remedies doctrine prohibits the retention of inconsistent remedies.

ASSOCIATE CHIEF JUSTICE LEE, dissenting:

¶88    The Utah Workers Compensation Act provides that "[t]he right to recover compensation" in an administrative proceeding under the statute "is the *exclusive* remedy against the employer" for "any accident or injury or death, in any way contracted, sustained, aggravated, or incurred by the employee in the course of or because of or arising out of the employee's employment." UTAH CODE § 34A-2-105(1) (emphasis added). A statutory claim is "in place of *any* and *all* other civil liability whatsoever, at common law or otherwise." *Id.* (emphasis added).

¶89    This exclusive remedy provision is the heart of the Workers Compensation Act. It preserves the essential bargain of workers compensation established almost a century ago in Utah. *See Shattuck-Owen v. Snowbird Corp.*, 2000 UT 94, ¶ 19, 16 P.3d 555 (referring to the "quid pro quo" of the statute). Under this bargain, workers give up their right to sue their employers in tort for workplace injuries. In return, workers are granted the right to statutory remedies that are afforded without regard to proof of fault. *See id.* (explaining that the statute gives employees a right to "recover for job-related injuries without showing fault" while assuring that "employers are protected from tort suits" (internal quotation marks omitted)).

¶90    Decades ago this court established an exception to this exclusive remedy provision. In *Bryan v. Utah International*, 533 P.2d 892, 894 (Utah 1975), we found the Act to be subject to an exception for claims based on "an *intentional* act." (emphasis added). In reaching that conclusion we noted that "personal injury, by accident" is defined by statute to "include injury caused by the willful act" of a fellow worker. *Id.*; *see also* UTAH CODE § 34A-2-102(1)(j)(i) ("'Personal injury by accident arising out of and in the course of employment' includes an injury caused by the willful act of a third person directed against an employee because of the employee's employment."). But we found a distinction between a *willful* act and an *intentional* one, asserting that the latter implies "that the act was not only done knowingly, but with the knowledge that it was wrongful to do it." *Bryan*, 533 P.2d at 894. And we upheld a right to sue in tort for intentional acts, noting the "policy of our law . . . to allow one injured through the intentional act of another[] to seek redress from the one intending harm" and emphasizing the "salutary effect of deterring intentional injury." *Id.*

¶91    We extended *Bryan* further in the decision we rendered at an earlier stage of this case, *Helf v. Chevron U.S.A., Inc.*, 2009 UT 11,

203 P.3d 962 (*Help I*). In *Help I* we held that proof of intent may be established in either of two ways—by proof "that the actor desired the consequences of his actions" or by demonstrating "that the actor believed the consequences were virtually certain to result." *Id.* at ¶ 43. In so holding, we relied on the term "accident" as it appears in the Act's exclusive remedy provision. We viewed the "'primary objective' of workers' compensation" as the elimination of "'industrial negligence, in all its forms, from the concept of the law of tort,'" and concluded that while "'[a]ccidents are an inevitable part of industrial production," "intentional torts by employers are not." *Id.* at ¶ 28 (quoting *Bryan*, 533 P.2d at 893, and *Beauchamp v. Dow Chemical Co.*, 398 N.W.2d 882, 889 (Mich. 1986)). And, under a conception of *accident* encompassing "unintended and unforeseen injurious occurrence[s]," *id.* ¶ 27 (quoting BLACK'S LAW DICTIONARY 15 (8th ed. 2004)), we deemed the Workers Compensation Act's exclusive remedy provision not to encompass acts that are intentional in the sense of either *intending* or *expecting* the injurious consequence, *id.* ¶ 43.

¶92 I would accept our holdings in *Bryan* and *Help I* under the doctrine of *stare decisis*. Such decisions may be in tension with the clear terms of the Workers Compensation Act's exclusive remedy provision.[1] But our holdings in these cases were square and

_____

[1] This provision is not limited to liability for *accidents*. It encompasses all claims for "any accident *or injury* or death, in any way contracted, sustained, aggravated, or incurred by the employee in the course of or because of or arising out of the employee's employment." UTAH CODE § 34A-2-105(1) (emphasis added). And the workers compensation remedy is "in place of any and all other civil liability whatsoever, at common law or otherwise." *Id.*; *see also Bryan v. Utah International*, 533 P.2d 892, 895 (Utah 1975) (Crockett, J., dissenting) (noting that judicial recognition of liability for an intentional tort is "plainly prohibited" by the terms of the exclusive remedy provision).

The *Bryan* majority's decision, moreover, overlooked a provision in an earlier iteration of the Act that was subsequently repealed—a provision that stated that "where an injury in employment resulted from *willful misconduct or willful disregard* of the employee's safety, the employee could have the option of either claiming compensation under the act or maintaining an action at law for damages." *Id.* (emphasis added). Because that provision was subsequently repealed, and replaced with a provision clarifying that the exclusive remedy provision extended to claims alleging willful misconduct, "[i]t seems so obvious as to not admit of doubt that it was the intent

straightforward. And they undoubtedly have sustained substantial reliance interests on the part of employees and employers. Unless and until our decisions become unworkable, or are overruled by the legislature, they are worthy of respect.

¶93 Respect for these decisions does not require that we extend them further, however. I respectfully dissent because I view the majority's decision as extending *Bryan* and *Help I* in a manner that is incompatible with the clear terms of the Workers Compensation Act and that distorts the law of election of remedies. I further dissent from the court's determination that the district court erred when it excluded deposition testimony offered by Helf, as the court's analysis on this point is inconsistent with the terms of rule 32(c) of the Utah Rules of Civil Procedure.

¶94 I would affirm on the ground that Jenna Helf voluntarily opted for the remedies available to her in workers compensation, in a manner foreclosing her right to sue in intentional tort under *Bryan* and *Help I*. Alternatively, I would affirm on the ground that the deposition testimony proffered by Helf was properly excluded by the district court.

I

¶95 The doctrine of election of remedies is longstanding and well-settled. One branch of the doctrine is a bar on double recovery. But there is more to the doctrine than that. As the majority acknowledges, the doctrine of election of remedies also precludes a plaintiff from advancing "legally or factually inconsistent recoveries for the same wrong." *Supra* ¶ 70. Under this branch of the doctrine, a plaintiff's election of a remedy is final once a "judgment is fully satisfied." *Supra* ¶ 71 (citing *Farmers & Merchs. Bank v. Universal*

and purpose" of the legislature to make workers compensation the exclusive remedy for all claims for compensation for workplace injuries. *Id.*; *see also id.* at 895–96 ("I cannot perceive how the statute could make it more clear that when workmen's compensation coverage is provided, that is the only remedy an injured employee has against his employer or a fellow employee. Whatever moral aspects of such a situation may be, that is the state of our law. . . . If there is to be any variance from or change in the law as declared by th[e] statute, it should be made by the legislature.").

Justice Crockett seems to have had the better of the argument in *Bryan*. But there has been a lot of water under the bridge since *Bryan*. So although I would have been inclined to rule otherwise on a matter of first-impression, I would leave *Bryan* and *Help I* in place for purposes of our decision in this case.

*C.I.T. Credit Corp.*, 289 P.2d 1045, 1049 (Utah 1955)). Satisfaction of the judgment, moreover, precludes more than just double recovery; it bars the plaintiff from asserting a new claim that is legally or factually incompatible with the already-satisfied claim. *See* RESTATEMENT (SECOND) OF TORTS § 896 cmt. a (1979) ("[W]hen the claim has been extinguished, as by judgment, or by satisfaction . . . a person is necessarily precluded from pursuing the other remedy."); RESTATEMENT (FIRST) OF RESTITUTION § 144 cmt. a (1937) ("[W]here conduct extinguishes the basic claim, as where there has been a recapture of goods or a satisfaction of the claim, . . . a person is necessarily precluded from pursuing the other remedy.").

¶96 This principle is both simple and well-settled. It holds the plaintiff to its initial election once a judgment is final and satisfied by the defendant. And it precludes subsequent litigation on an inconsistent theory of liability—not just because double recovery is prohibited, but because it is unfair to subject the defendant to a subsequent round of litigation on a new, inconsistent theory of liability. *See, e.g., F.T.C. v. Leshin*, 719 F.3d 1227, 1232 (11th Cir. 2013) (The doctrine of election of remedies . . . . limits a party with the choice of two remedies that are inconsistent with each other from obtaining both remedies or from obtaining first the one remedy and then, at a later date, an alternative one." (internal quotation marks omitted)); *Connectu LLC v. Zuckerberg*, 522 F.3d 82, 89 (1st Cir. 2008) ("The election of remedies doctrine is grounded on equitable principles."); *see also* AM. JUR. 2D *Election of Remedies* § 3. That principle should apply here. Ms. Helf filed a workers compensation claim and was awarded compensation on the basis of an allegation that her injuries resulted from a workplace *accident*. Under the doctrine of election of remedies, Helf should now be barred from advancing the inconsistent theory that her injuries were the result of an *intentional tort*. By allowing Helf to treat her injury as caused both by an accident and an intentional tort, we flatly contradict *Helf I*, which found injuries due to the latter cause could not also be attributed to the former. *See Helf I,* at ¶¶ 28, 43.

¶97 A stricter variation on this rule has long since been abandoned. Under the liberal pleading standards of the rules of civil procedure, we no longer foreclose plaintiffs from merely *asserting* inconsistent theories of liability in alternative claims in a single proceeding. *See* UTAH R. CIV. P. 8(e) (allowing pleading in the alternative); *Parrish v. Tahtaras*, 318 P.2d 642, 645 (Utah 1957) (recognizing that modern pleading rules obviate the election of remedies bar on alternative pleading). But our rules of procedure say nothing of relevance to the assertion of a new theory of liability in a

separate suit filed *after* the entry and satisfaction of a final judgment on an incompatible one. And we have never departed from our longstanding commitment to the preclusion of such new claims.

¶98    Until today. The majority declines to give preclusive effect to the final judgment on Helf's workers compensation claim under a longstanding principle of the doctrine of election of remedies. It does so, moreover, in apparent recognition of the fact that Helf's claim is barred under the law as it now stands—a law it deems "'tricky and technical,'" and subject to adaptation by the court to "produce fair outcomes for litigants." *Supra* ¶ 85 (quoting 10 ARTHUR LARSON & LEX K. LARSON, LARSON'S WORKERS' COMPENSATION LAW § 115.05 (2014)). Thus, seeing a "cruel dilemma" for workers faced with a choice between a workers compensation claim and an intentional tort claim, the court declines to give "strict application" to the doctrine of election of remedies. *Supra* ¶ 80. It also recognizes an inequity in its decision, however—in the potential for "double recovery." *Supra* ¶ 85. So although the court does not foreclose Helf's claim, it establishes a right of her employer to seek reimbursement to the extent of any payment of workers compensation benefits if Helf prevails in her tort claim. *Supra* ¶ 86.

¶99    I respectfully dissent from this decision. The law of election of remedies may be a "rule of 'procedure or judicial administration.'" *Supra* ¶ 85. But it is—and has long been—the law of this state. A litigant like Chevron should be entitled to rely on it. The doctrine of election of remedies assures "fair outcomes" *for all litigants*, not just plaintiffs. And a core element of this law, from the standpoint of a defendant, is a right of repose—a right to rely on the finality and preclusive effect of a judgment that has been satisfied by the defendant. *Dep't of Envtl. Mgmt. v. State*, 799 A.2d 274, 277 (R.I. 2002) ("The doctrine of election of remedies is one that is grounded in equity and is designed to mitigate unfairness to *both* parties . . . ."(emphasis added)); *Barbe v. Villeneuve,* 505 So. 2d 1331, 1332 (Fla. 1987) ("The election of remedies doctrine is an application of the doctrine of estoppel . . . ."). *See also* AM. JUR. 2D *Election of Remedies* § 3 (2014) ("The doctrine of election of remedies, being equitable in nature, is designed to mitigate possible unfairness to *both* parties" (emphasis added) (footnote omitted)). The court arbitrarily overrides this important policy in preserving "fairness" for plaintiffs like Ms. Helf.

¶100  In so doing, the majority not only distorts the doctrine of election of remedies; it also overrides the clear terms of the exclusive remedy provision of the Workers Compensation Act. That provision, as noted, provides that an administrative action "is the exclusive

remedy against the employer" for "any accident or injury or death" sustained "in the course of or because of or arising out of the employee's employment," and is "in place of any and all other civil liability whatsoever, at common law or otherwise." UTAH CODE § 34A-2-105(1). Our prior decisions have made inroads on the seemingly categorical terms of this provision. I accept those decisions, as noted above, as a matter of *stare decisis*. But I cannot accept the court's decision to extend the intentional tort exception in a manner doing further violence to the clear terms of the Workers Compensation Act.

¶101 Perhaps an intentional tort can be deemed to fall outside the Act—because, for example, only accidents, and not intentionally tortious acts, "'are an inevitable part of industrial production.'" *Helf v. Chevron U.S.A., Inc.*, 2009 UT 11, ¶ 28, 203 P.3d 962 (quoting *Beauchamp v. Dow Chemical Co.*, 398 N.W.2d 882, 889 (Mich. 1986)). But the reality is that the line between these two events will often be a fuzzy one. That is particularly true in a case like this one, where the defendant's alleged intent is not in a *motive* to cause harm but in engaging in conduct "expected" to produce such a result. In a case like this, it should hardly be surprising for a plaintiff to opt to file an administrative claim under the Workers Compensation Act—to take advantage of the "simple, adequate, and speedy" remedy available by statute. *Park Utah Consol. Mines Co. v. Indus. Comm'n*, 36 P.2d 979, 981 (1934). In advancing that claim, moreover, the employee has necessarily established that she suffered an injury arising out of her employment. And she has secured the full advantage of the remedies available under the Act when her employer satisfied the judgment entered against it.

¶102 I see nothing unfair about holding the employee to the benefit of the bargain she sought in securing the recovery available to her under the Workers Compensation Act. That conclusion follows not only as a matter of the law of election of remedies, but also, quite clearly, from the exclusive remedy provision of the Act. Once the employee has sued and recovered on a claim for an injury arising out of her employment, the legislature has clearly directed that such is the exclusive remedy, replacing any common law claim. We are bound by that directive—even if we see unfairness in the "dilemma" it presents to employees. *Supra* ¶ 80. The answer to that concern is not to override the terms of the statute; it is to defer to the legislature's policy judgment, while leaving any concerns with it to the process for statutory amendment.

¶103 The dilemma described by the majority, moreover, is overstated. In most cases (this one included), the employee will have

access to most of the relevant evidence at the time she decides whether to allege an accident or an intentional tort. The outcome of the plaintiff's preferred claim may not be certain, but the relevant facts likely will be well known. Thus, a plaintiff who chooses to initiate a tort claim cannot be sure that her suit will succeed, but she will likely have the evidence she needs to decide whether to pursue that route instead of a workers compensation claim. And for that reason the principal effect of the majority's decision is not to assure fairness to litigants but to preserve the plaintiff's right to have it both ways—to secure all of the upsides of the "simple, adequate, and speedy" remedy available under the Workers Compensation Act, *Park Utah Consol. Mines Co*, 36 P.2d at 981, while still preserving the possibility of a bigger payout in a subsequent tort suit.

¶104 Our concern for fairness ought to spark more than a one-sided interest in expanding an employee's grounds for recovery. It should also lead us to consider the legitimate interests of employers in relying on the finality of a workers compensation judgment that is both final and satisfied by the employer. We can protect those interests without closing the door to an intentional tort suit.

¶105 An employee who believes she is the victim of a workplace act that could alternatively be conceived as either accidental or intentional can make an informed election of her preferred remedy—of a streamlined workers compensation claim (which would hold the promise of defined benefits without regard to fault) or a more drawn out tort claim (with greater upside in terms of damages but the uncertainties inherent in a requirement of proving fault). Such a choice may not always be easy[2]; but I see nothing

---

[2] The standard for invoking the doctrine of election of remedies has nothing to do with the *ease* of the plaintiff's election. Our law requires only a "knowledgeable selection" of one remedy over another that is "free of fraud or imposition." *Royal Res., Inc. v. Gibralter Fin. Corp.*, 603 P.2d 793, 796 (Utah 1979). That standard is easily met here. To the extent a plaintiff like Ms. Helf faces a "dilemma," *supra* ¶ 80, it is only because the choice between a streamlined claim for a limited benefit and a more difficult claim with greater upsides is an inherently difficult one. That has never been a basis for overriding the doctrine of election of remedies, however, and it should not be such here. *See United States v. Oregon Lumber Co.*, 260 U.S. 290, 301 (1922) (explaining that merely "underestimat[ing] the strength of [your] cause" is not enough to avoid the effect of the doctrine of election of remedies; stating that "if that were sufficient to warrant the bringing of a second and

unfair about holding a plaintiff to the election she made voluntarily. Our law of election of remedies has long held the plaintiff to that choice. It is unfair to the employer to abandon that law in a manner that gives the plaintiff all of the upsides of a workers compensation claim without granting the employer the benefit of the guarantee of the exclusive remedy provision of the Workers Compensation Act.

¶106 A worker who sues and recovers on a workers compensation claim has the benefit of the exclusive remedy assured to her under the Workers Compensation Act. That is the course that Ms. Helf chose in this case, and she should be held to that choice.

¶107 The opposite course—of suing on an intentional tort instead of filing a workers compensation claim—may be economically taxing to a plaintiff. *See supra* ¶ 80 (raising concerns about a plaintiff's ability to "survive without any benefits" during "potentially protracted litigation"). But that is the whole point of the workers compensation scheme. The statute provides a streamlined mechanism for an award of benefits without regard to proof of fault in order to minimize the hardship to employees who are injured on the job. There is a *quid pro quo* for that streamlined process, however. In exchange for streamlined benefits the statute cuts off the employee's right to sue in tort.

¶108 I dissent from a decision that preserves the benefit of the workers compensation bargain for employees while depriving employers of their side of the deal. Policy concerns over the fairness of the exclusive remedy provision should be directed to the legislature. We overstep our authority in bending the law of election of remedies in a manner overriding the clear terms of the Workers Compensation Act.[3]

---

inconsistent action the result would be to confine the defense of election of remedies to cases where the first suit had been won by [the] plaintiff and to deny it in all cases where plaintiff had lost," and that election is "determined by the bringing and maintenance of the suit, not by the final disposition of the case by the court").

[3] The majority's decision to recognize an employer's right to seek reimbursement for workers compensation benefits paid by an employer or insurer, *supra* ¶ 86, is perhaps laudable as a matter of policy or fairness. But it only highlights the fact that the court is overwriting the clear terms of the Workers Compensation Act. The statute, of course, has no provision for such a claim for reimbursement. So the majority's decision can only be understood as a judicial rewrite—a decision to fill in a hole that the court finds in the terms of the statute (a hole created by our decisions in *Bryan v.*

¶109 The cases cited by the majority, *supra* ¶ 83 n.10, are unpersuasive for two reasons. First, the holdings of two of those cases were mandated by state statutes establishing an intentional tort exception to the applicable exclusive remedy provision.[4] Second, the remaining cases speak only to the common law question presented — of the fairness of giving effect to the doctrine of election of remedies in a manner cutting off claims of employees,[5] or of the policy concern

---

*Utah Internationall*, 533 P.2d 892 (Utah 1975) and *Helf v. Chevron U.S.A., Inc.*, 2009 UT 11, 203 P.3d 962).

[4] *See Gagnard v. Baldridge*, 612 So. 2d 732, 735 (La. 1993) ("In 1976, the legislature amended Section 1032 of the Worker's Compensation Act to make the exclusive nature of the compensation remedy inapplicable to intentional acts."); *Dominguez ex rel. Hamp v. Evergreen Res., Inc.*, 121 P.3d 938, 943 (Idaho 2005) ("In this case, [the petitioner] has alleged a willful or unprovoked physical aggression by his employer, and therefore his claim falls into a statutory exception to the exclusive remedy rule.").

[5] *See Suarez v. Dickmont Plastics Corp.*, 639 A.2d 507, 515 & n.9 (Conn. 1994) ("Although the doctrine of election, to the extent that it is designed to prevent double redress for the same injury, has a sound basis, it can also serve to destroy all rights under compensation acts without justification. . . . To the extent that the election requirement may interfere with an injured employee receiving compensation for his or her injuries, it should be avoided"); *Millison v. E.I. du Pont de Nemours & Co.*, 501 A.2d 505, 518–19 (N.J. 1985) ("Precluding plaintiffs from a common-law cause of action for intentional wrongs because they have already chosen to seek the relief available under workers' compensation would be an unduly harsh and technical application of the election-of-remedies doctrine. . . . Plaintiffs who lose that gamble [of selecting a tort suit over workers compensation] will be left totally uncompensated . . . ."); *Woodson v. Rowland*, 407 S.E.2d 222, 233 (N.C. 1991) ("The result thus obtained [allowing simultaneous workers compensation claims and tort suits] would be a more equitable one than forcing an employee who believes in good faith that he was injured by the intentional misconduct of his employer to forgo his compensation claim in order to maintain his common law claim.") (internal quotation marks omitted); *Jones v. VIP Development Co.*, 472 N.E.2d 1046, 1054 (Ohio 1984) ("To consider the receipt of benefits a forfeiture of an employee's right to pursue the employer in the courts would not only be harsh and unjust, it would also frustrate the laudable purposes of the Act . . . .").

regarding perverse incentives for employers.[6] That analysis falls short, as noted above, because it ignores the interest of fairness to employers. But it also fails to account for the clear terms of the exclusive remedy provision of the Workers Compensation Act. It is one thing to say that a workplace injury sustained as a result of an intentional tort is somehow not an "injury . . . in the course of or because of or arising out of the employee's employment." UTAH CODE § 34A-2-105(1). It is quite another, however, to say that such an injury once characterized as such *in a suit brought to fruition (and satisfaction) by an employee* can later lose that character in a subsequent suit filed by the same employee.[7]

¶110 None of the cases cited by the majority offer a basis for reconciling the decision to abandon the doctrine of election of remedies with the clear terms of the Workers Compensation Act.[8] I

---

[6] *Elliott v. Brown*, 569 P.2d 1323, 1327 (Alaska 1977) ("We do not believe it would be wise public policy to allow an intentional tortfeasor to shift his liability for his acts to such a fund. Assaults by fellow workers differ not in degree but in kind from the type of harm the [workers compensation] statute was enacted to deal with.").

[7] The unfairness of allowing the employee to have it both ways is underscored by a straightforward application of the doctrine of issue preclusion. Under settled law, the final resolution of an issue in a first round of litigation is binding on the same parties in a subsequent case. *See, e.g., Oman v. Davis Sch. Dist.*, 2008 UT 70, ¶ 31, 194 P.3d 956; *see also* RESTATEMENT (SECOND) OF JUDGMENTS § 27 (1982). This principle, moreover, is rooted in core concerns as to fairness. *See, e.g., Jack Faucett Assocs., Inc. v. Am. Tel. & Tel. Co.*, 744 F.2d 118, 125 (D.C. Cir. 1984) ("This notion of fairness reflects the equitable nature of issue preclusion."). It makes little sense to require the same parties to relitigate an issue that was conclusively resolved in earlier proceedings.

[8] For the most part, the cited cases are rooted in the courts' insistent confidence in their understanding of the true *purpose* of workers compensation—that the "spirit and purpose" of workers compensation is compatible with a subsequent suit alleging an intentional tort. *See Jones v. VIP Dev. Co.*, 472 N.E.2d 1046, 1054 (Ohio 1984). Our role in statutory interpretation, however, is not to give effect to a law's amorphous *purpose*; it is to follow its text. *See Hughes Gen. Contractor, Inc. v. Utah Labor Comm'n*, 2014 UT 3, ¶ 29, 322 P.3d 712 ("[T]he interpretive function for us is not to divine and implement the statutory purpose, broadly defined. It is to construe its language."); *Strohm v. ClearOne Commc'ns, Inc.*, 2013 UT 21, ¶ 32, 308 P.3d 424 ("The text of the statutory . . . scheme is the governing

would give effect to the statute. And I would leave any policy concerns regarding the effects on plaintiffs to the process for legislative amendment.

## II

¶111 Under our rules of civil procedure, "[o]bjections to the competency of a witness or to the competency, relevancy, or materiality of testimony are not waived by failure to make them before or during the taking of the deposition, unless the ground of the objection is one which might have been obviated or removed if presented at that time." UTAH R. CIV. P. 32(c)(3)(A). The majority views this rule as overriding the ground identified by the district court for refusing to consider the deposition testimony advanced by Ms. Helf on summary judgment. In the deposition in question, a union representative was asked by counsel for Chevron whether the dayshift supervisor had any "role" in "instructing Ms. Helf to neutralize the pit on the nightshift." The deponent didn't answer that question. Instead he volunteered, based on an "interview" that the union representative had with the dayshift supervisor, that the dayshift supervisor had given a "turnover to the nightshift [supervisor]," in which he told him "what they had tried, what had happened, the alarms went off, people … got sick," or in other words "just ma[king] him aware . . . that they got so many complaints of the odor, people getting sick and the alarms, that they shut it down."

---

public policy in this area. . . . By applying the statute as written, we remain faithful to the public policy embraced by the legislature."); *Hooban v. Unicity Int'l*, 2012 UT 40, ¶ 17, 285 P.3d 766 ("Our evaluation of the statute's purpose must start with its text . . . .); *Myers v. Myers,* 2011 UT 65, ¶ 28, 266 P.3d 806 ("Our role in interpreting this statute is to read and interpret its text"). Because the text of the exclusive remedy provision is clear, moreover, we cannot override it with our sense of the legislature's true purpose. *See Olsen v. Eagle Mountain City*, 2011 UT 10, ¶ 23 & n.6, 248 P.3d 465 ("[S]peculation as to a contrary legislative purpose cannot quash our construction of the plain language."); *Schroeder Invs., L.C. v. Edwards*, 2013 UT 25, ¶ 25, 301 P.3d 994 ("[O]verrid[ing] clear statutory text on policy grounds misperceives the judicial function." (internal quotation marks omitted)); *Hooban v. Unicity Int'l, Inc.*, 2012 UT 40, ¶ 17, 286 P.3d 766 ("Where the statute's language marks its reach in clear and unambiguous terms, it is our role to enforce a legislative purpose that matches those terms, not to supplant it with a narrower or broader one . . . .").

¶112 Chevron's counsel made no objection to this testimony during the deposition. But in the course of the summary judgment proceedings, Chevron did file a motion to strike it, asserting that it was hearsay and that the union representative lacked personal knowledge. The district court rejected those grounds, but nonetheless excluded the testimony on the grounds that it lacked foundation and was nonresponsive to the question asked. And the court granted Chevron's motion for summary judgment on the ground that Helf had failed to produce admissible evidence that the night supervisor knew that workers had been sickened by the neutralization process during the day shift.

¶113 I would affirm that decision. In so doing I would reject the argument advanced by Ms. Helf—and endorsed today by the majority—deeming the court's grounds for excluding the deposition testimony subject to waiver under rule 32(c) of the Utah Rules of Civil Procedure.

¶114 This rule applies only to objections (as to competency, relevance, or materiality) that could have been "obviated or removed if presented at that time." *Id*. In context, and in line with longstanding practice and settled caselaw, such objections are those that could be "obviated or removed" *by the reformulation of the question by the attorney asking it*. *See, e.g.*, 21 CHARLES ALAN WRIGHT & KENNETH W. GRAHAM, JR., FEDEDERAL PRACTICE & PROCEDURE § 5037.6 (2d ed. 2005); *Rosary-Take One Prod. Co. v. New Line Distrib., Inc.*, no. 89 Civ. 1905(CSH), 1996 WL 79328, at *2 (S.D.N.Y. Feb. 23, 1996). That is the only way an objection along these lines could be "obviated or removed," as there is no judge presiding at the deposition standing ready to rule on an objection that goes to admissibility. Thus, the exception in rule 32(c) has long been understood to apply only to objections that can be remedied by a reformulation of the question that was posed; for other objections (remediable only by a ruling by the court, for example), the general rule of non-waiver applies. *See* 8A CHARLES ALLEN WRIGHT, ARTHUR R. MILLER & RICHARD L. MARCUS, 8A FEDERAL PRACTICE & PROCEDURE § 2151 (3d ed. 2010).

¶115 This principle is reinforced by at least one of the authorities cited by the majority, *Jordan v. Medley*, 711 F.2d 211 (D.C. Cir. 1983). The *Jordan* case involved a claim for civil assault, and an attempt by the plaintiff to introduce evidence of a prior charge against the defendant for a crime of assault with a dangerous weapon. This matter had come up during a deposition of the defendant, in which the defendant was asked about prior charges against him, and he responded (without any objection), "assault with

a dangerous weapon." *Id.* at 217. At trial, plaintiff sought to foreclose any objection to the admissibility of this evidence under rule 32(c) of the Federal Rules of Civil Procedure, asserting that defendant had waived his right to object at trial because "if objection to the inquiry concerning criminal charges had been made at the time of the deposition, the inquiry could have been limited to criminal *convictions*." *Id.* at 218. Yet the D.C. Circuit rejected that argument. It explained that an objection under these circumstances "would have 'obviated or removed' the objection only by simultaneously eliminating the testimony in question, which is evidently not what the Rule has in mind." *Id.* If that were the law, the court explained, "all failures to object would produce a waiver, and the Rule's exception would be converted into an invariable rule." *Id.* Because rule 32(c) "obviously envisions" a circumstance where "a timely objection (*e.g.*, on the ground of failure to lay an adequate foundation) could have enabled the problem to be remedied so that *the same testimony* could be received in accordance with law," the court rejected the argument for waiver.[9] *Id.* (citation omitted).

¶116   The same conclusion is appropriate here. The problems with the union representative's testimony are not issues that could have been obviated by a reformulation of the question posed by counsel. Instead the issue went to the admissibility of the deponent's testimony—of his hearsay assertions regarding the statements that the day supervisor made to the night supervisor (according to an "interview" the union representative had with the day supervisor). No reformulation of the question could obviate the problems with that testimony. An objection could only have "eliminat[ed] the testimony in question, which is evidently not what [rule 32(c)] has in mind." *Id.* There is no way a "timely objection . . . could have enabled the problem to be remedied so that *the same testimony* could be received in accordance with law." *Id.* So this is not the kind of objection that Chevron was required to raise during the deposition. For that reason the general rule (no objection required) was properly invoked by the district court.

¶117   An "objection" is, by its very nature, an assertion raised *by an opponent. See* Wright & Miller, 21 CHARLES ALAN WRIGHT & KENNETH W. GRAHAM, JR., FEDEDERAL PRACTICE & PROCEDURE §

---

[9] *See also McKelvy v. Darnell*, 587 So. 2d 980, 984 (Ala. 1991) ("The rule requires that, if a timely objection would enable the questioner to remedy the problem so that *the same testimony* could be received in accordance with law, the objection must be made at the time the deposition is taken.").

5037.6 (2d ed. 2005) ("[O]ne must object to a nonresponsive answer at the deposition because the proponent could simply ask an appropriate question to make the evidence admissible"). It seems more than a little strange to speak of a party's duty to object to the form of its own question. I would read rule 32(c) in light of this understanding. I would limit it to an opposing party's objection to a question posed to a deponent. *See id.; see also McKelvy v. Darnell*, 587 So. 2d 980, 984 (Ala. 1991) ("The rule requires that, if a timely objection would enable the *questioner* to remedy the problem so that *the same testimony* could be received in accordance with the law, the objection must be made at the time the deposition is taken") (emphasis added); *Rosary-Take One Prod.*, 1996 WL 79328, at *2) ("The policy underlying the rule is to give the *inquiring* attorney an opportunity to cure the defect . . . ." (emphasis added)).

¶118   The majority's contrary conclusion may find some support in a few outlying cases. *See supra* ¶ 39 (citing *Kirschner v. Broadhead*, 671 F.2d 1034 (7th Cir. 1982)). But it is difficult to reconcile with the terms of the rule. An opposition to the admissibility of a deponent's testimony by the party conducting the deposition is not an *objection* that could be obviated by the reformulation of a question; it is a motion to strike the answer.

¶119   Today's decision will result in no small degree of upheaval in deposition practice in Utah. If a party conducting a deposition has an obligation to preserve a motion to strike testimony it deems inadmissible, depositions are sure to be bogged down in collateral objections (raised on the record but with no judge to rule on them). That practice runs directly contrary to the obvious intent of rule 32. *See* 21 WRIGHT, *supra*, § 2156 (noting that the rule is aimed at assuring that depositions "not be unduly lengthened or obstructed by interposing objections").

¶120   The court's new requirement, moreover, will surely catch many parties unawares. It will hardly come naturally for an attorney conducting a deposition to lay the groundwork for rehabilitating testimony that is problematic but inadmissible on its face. But that is what the court today requires in reading rule 32(c) to require preservation of a motion to strike inadmissible evidence.

¶121   I respectfully dissent. I would read rule 32(c) to be limited to objections by an opponent that could be obviated by the reformulation of the deposing party's question. And because the matter here was not such a matter, I would reject the waiver argument raised by Ms. Helf. Absent any argument for waiver, moreover, I would affirm the district court's decision to strike the deposition in question.

¶122 That decision would also lead me to affirm the district court's decision granting Chevron's motion for summary judgment. Without this deposition testimony, there was not a sufficient basis in the record for a reasonable factfinder to conclude that the Chevron night supervisor knew that an injury to Helf was virtually certain to occur. For reasons identified by the district court, I would affirm the decision granting summary judgment to Chevron even absent an election of remedies defense.